**Elizabeth LUETH, Plaintiff,**

v.

**ST. CLAIR COUNTY COMMUNITY COLLEGE, Frederick Hauenstein, and Jennifer Durham, Defendants.**

**Civ. A. No. 89–CV–30006 PH.**

United States District Court,
E.D. Michigan, S.D.

Feb. 5, 1990.

Lee A. Strickler, McIntosh, McColl, Carson, McNamee, Strickler & Houle, Gary E. Mach, Edson & Sheldon, Steve B. Lockhart, Flanigan, Monaghan, & Traver, Port Huron, Mich., Robert A. Sedler, Detroit, Mich., Derwin Rushing, Zick, Swegles & Rushing, Marysville, Mich., for plaintiff.

Gary A. Fletcher, Mark G. Clark, Touma, Watson, Nicholson, Fletcher & DeGrow Port Huron, Mich., for defendants; Timothy Young, Cummings, McClorey, Davis & Acho, P.C., Livonia, Mich., of counsel.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

Presently pending are cross-motions for summary judgment, through which the parties desire resolution of a dispute concerning the defendants' prohibition against the publication of an advertisement in a community college-associated newspaper. Basically, the plaintiff, ex-Editor-in-Chief of the paper, contends that the defendant Dean Frederick Hauenstein's (hereafter "the dean") decision to prohibit publication of the relevant advertisement violated her first amendment free speech rights, and that this violation caused her mental distress. The plaintiff therefore seeks money damages pursuant to 42 U.S.C. § 1983.

The defendants initially urge that the plaintiff lacks standing to pursue her section 1983 claim, since she voluntarily terminated her relationship with the newspaper shortly after the issuable incident. Second,

the defendants argue that even if the plaintiff possesses standing to proceed, her allegations fail to set forth a first amendment violation in light of controlling precedent.

The Court has heard oral argument, and is now prepared to rule.

## I.

In determining whether summary judgment is appropriate, the Court must be satisfied that no genuine issue of material fact exists, and that absent any such issue judgment may be entered as a matter of law. Fed.R.Civ.P. 56(c). The movant bears the burden of informing the Court of the basis for its motion, yet is not required to provide materials negating an opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant satisfies this initial requirement "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party," and "[i]f [such] evidence is merely colorable, . . ., or is not significantly probative, . . ., summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citations omitted).

## II.

The *Erie Square Gazette* is a student-run newspaper affiliated with the defendant St. Clair County Community College, a two-year, state-funded, post-secondary educational institution. The Student Government Board of Control, consisting of one faculty advisor (the defendant Jennifer Durham) and five student members, created the *Gazette* as a "student administered student service" and continues to generally oversee its operation. The *Gazette* receives the majority of its funding from a one dollar registration fee charged to students, with additional revenue generated through advertising. Students working for the *Gazette* may receive academic credit and full or partial scholarships; participation is not available through any specific journalism course.

The plaintiff, while Editor-in-Chief of the *Gazette*, received a full academic scholarship. As Editor-in-Chief, and pursuant to rules and regulations governing the *Gazette's* operation, the plaintiff retained discretion in deciding the newspaper's content, staffing, and publication dates. This discretion was subject to the oversight of a Board of Authority, consisting of two students elected from the Student Government, two student staff members of the *Gazette*, and one student chairman appointed by the Student Government president.

On November 1, 1988, the plaintiff printed an advertisement for a Canadian nude dancing club, Cheri Champaigne's, on the first page of the *Gazette*.[1] The advertisement particularly noted the Canadian drinking age, 19, and the total nudity of the dancers; Michigan's drinking age is 21, and totally nude dancing is prohibited by law.

On November 7, 1988, the dean informed the plaintiff that further publication of the nude dancing advertisement in the *Gazette* was prohibited. The Board of Control concurred in the dean's action, and the advertisement was thereafter omitted from publication in the *Gazette*.

On December 29, 1988, the plaintiff filed this action. On January 9, 1989, the plaintiff, in a letter to the Board of Control, formally resigned as Editor-in-Chief of the *Gazette*, citing "personal reasons and family complications" as bases for her resignation.

## III. STANDING

■ The defendants urge that because the plaintiff is no longer associated with the *Gazette*, her first amendment claim is moot. Certainly this is correct concerning any request for injunctive relief; the same, however, is incorrect respecting the plaintiff's request for compensatory damages.

The Sixth Circuit recognizes the availability of money damages for emotional distress arising from first amendment violations. *See Walje v. City of Winchester, Ky.*, 827 F.2d 10 (6th Cir.1987); *Parrish v.*

---

**1.** Port Huron, Michigan, the location of St. Clair County Community College, lies directly across the St. Clair River from Sarnia, Ontario, the site of Cheri Champaigne's.

*Johnson,* 800 F.2d 600 (6th Cir.1986). The plaintiff's complaint, at paragraph E, specifically requests a damage award for "mental anguish, humiliation, loss of opportunity, and educational and professional standing." Thus, the Court finds that the plaintiff possesses standing to proceed with her claim for money damages against the defendants, but dismisses her requests for injunctive relief as moot.[2]

## IV. CHARACTER OF THE SPEECH AT ISSUE

Initially, the Court must examine the character of the speech the plaintiff seeks to protect in order to apply the appropriate standard for reviewing the defendants' conduct. The defendants argue that the advertisement contained solely commercial speech, and that therefore the defendants retained substantial latitude in deciding whether to suppress the speech. The plaintiff, conversely, urges that information contained in the advertisement regarding Canadian drinking and nudity laws transforms the advertisement into more than simple commercial speech, entitling the advertisement to greater protection.

■ Generally, speech is considered commercial if it "propose[s] a commercial transaction." *Bd. of Trustees of the State University of New York v. Fox,* —— U.S. ——, ——, 109 S.Ct. 3028, 3031, 106 L.Ed.2d 388, 399 *mot. denied,* —— U.S. ——, 110 S.Ct. 228, 107 L.Ed.2d 181 (1989), quoting *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). An exception to this test exists, however, when speech proposing a commercial transaction is "inextricably intertwined with otherwise fully protected speech." *Id.,* quoting *Riley v. Nat'l Federation of the Blind of North Carolina, Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In *Fox,* the respondents asserted that their tupperware par-

ties, prohibited by university resolution, involved the use of noncommercial speech due to the inclusion of home economic advice, arguably fully protected speech, in their sales presentations. Since, respondents urged, this advice was inextricably intertwined with the sales portion of the respondents' presentation, the tupperware parties should not have been considered commercial speech.

■ In rejecting this analysis, the Supreme Court noted that "[n]o law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares." —— U.S. at ——,109 S.Ct. at 3031, 106 L.Ed.2d at 400. This reasoning is particularly relevant to the instant case. The noncommercial aspects of the pertinent advertisement, concerning Canadian drinking and nudity laws, are not absolutely necessary to the sale of the product at issue. While reference to these laws is undoubtedly included in the advertisement as a sales tool and may in fact help the advertiser's business, the advertiser could nevertheless promote its business without referencing the relevant laws. Thus, since the advertising unquestionably proposes a commercial transaction, and since the alleged noncommercial speech contained within the advertisement is not inextricably intertwined with the purely commercial speech, the Court treats the advertisement as commercial speech in evaluating the defendants' conduct.

## V.

■ Prior to examining the defendants' conduct given the commercial character of the speech, it bears noting that the nature of the regulated forum is of critical importance in evaluating a government's interest in regulating that forum. Indeed, government defendants placing content-based re-

---

**2.** The defendants' additional contention that the first amendment rights violated, if any, inure solely to the advertiser's benefit is unavailing. The plaintiff alleges an unconstitutional interference with her right to determine the content of the *Gazette,* and does not charge that the defendants violated Cheri Champaigne's right to advertise. The two rights are distinct. *See, e.g.,*

*Pittsburgh Press Co. v. Pittsburgh Commission on Human Rights,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 *reh'g denied,* 414 U.S. 881, 94 S.Ct. 30, 38 L.Ed.2d 128 (1973); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (both cases involving newspapers' rights to publish advertising).

strictions on publications deemed to be something other than true public forums face a lessened burden in justifying the challenged restrictions than do government defendants regulating speech in a true public forum. In the instant context, then, the pertinent issue is whether the *Gazette* represents a "true" public forum, or whether instead the *Gazette* "is not by tradition or designation a forum for public communication...." *Perry Educational Assn. v. Perry Local Educational Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). If the former, any content-based prohibitions "must be narrowly drawn to effectuate a compelling state interest."[3]  *Id.*, citing *Widmar v. Vincent*, 454 U.S. 263, 269–270, 102 S.Ct. 269, 274–275, 70 L.Ed.2d 440 (1981). If the latter, "the State may reserve the forum for its intended purposes, communication or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*, citing *United States Postal Service v. Council of Greenburgh*, 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981). In assessing the public character of a state-controlled forum, courts evaluate whether authorities "have 'by policy or by practice' opened [the forum] 'for indiscriminate use by the general public,' ... or by some segment of the public, such as student organizations." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 567, 98 L.Ed.2d 592, 603 (1988), quoting *Perry, 460 U.S.* at 46 n. 7, 47, 103 S.Ct. at 955, n. 7.

*Kuhlmeier* involved an assessment of whether a high school student newspaper constituted a public forum, therefore entitled to full first amendment protection. In concluding that the newspaper was not a true public forum, the Supreme Court emphasized the following:

1. Formal school board policy provided that the newspaper was developed within its adopted curriculum and such curriculum's educational implications.

2. The school's curriculum guide described the journalism course associated with publication of the newspaper as a "laboratory situation" allowing application of skills learned in a prerequisite journalism course.

3. The journalism course was taught by a faculty member during regular class hours, and students received graded credits for participation.

4. The teacher of the journalism class selected the newspaper's editors, set publication dates, assigned stories, advised in the development of stories, edited, and negotiated with printers.

5. The school principal conducted final review of each issue of the newspaper prior to publication.

6. School officials did not deviate in practice from the policies surrounding the newspaper's publication.

484 U.S. at 268, 108 S.Ct. at 568, 98 L.Ed.2d at 603. These factors contravened the court of appeal's conclusion that the school district, in establishing the school newspaper, demonstrated a "clear intent to create a public forum." *Id.* 484 U.S. at 270, 108 S.Ct. at 569, 98 L.Ed.2d at 604, quoting *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985).

■ Comparing the operation of the *Kuhlmeier* newspaper with that of the *Gazette* reveals significant differences between the two. First, the *Gazette* does not operate in a "laboratory situation," in that the *Gazette* is not operated under the guise of a specific academic course, and exists under formal school policy as a student administered activity and not within the defendant community college's "adopted curriculum." Second, the *Gazette* is not created under the direction of a faculty member, but is instead operated entirely by student participants, particularly the Editor-in-Chief. In fact, the Editor-in-Chief, per express terms of the Rules and Regulations of the *Gazette*, fulfills most of the obligations attributed to the *Kuhlmeier*

---

**3.** The Court notes that this test applies only to noncommercial speech, and as indicated at page 1413 of this opinion, a state may prohibit commercial speech upon demonstrating a substantial, as opposed to a compelling, state interest.

teacher. Finally, the *Gazette* is freely distributed throughout the local community, and seeks outside advertisers to aid in the funding of the paper's publication.

The Court believes these differences are material in evaluating the public nature of the *Gazette*. Acknowledging the Supreme Court's directive that a state's intent to create a public forum cannot arise from "inaction or by permitting limited discourse," the Court cannot ignore the following unequivocal language contained in the *Gazette's* Rules and Regulations:

> Statement of Purpose: The functions of the *Erie Square Gazette* are as follows:
>
> 1. To inform the student body of happenings and events that are of general interest.
>
> 2. To entertain the student body.
>
> 3. To influence the student body in worthwhile objectives and to bring about needed reforms in those areas concerning students.
>
> Statement of Policy: The editor-in-chief, under the auspices of its *Erie Street Gazette* Board of Authority, makes all policy decisions regarding what is printed in the paper, staff appointments and dismissals, and publication dates.
>
> \*   \*   \*   \*   \*   \*
>
> *Erie Square Gazette* shall be a vehicle open to the expression of all views, whether contrary to *Gazette* or college policy as long as those views follow those standards preset by the *Erie Square Gazette*.
>
> 1. All statements of view have to be signed and [sic] labeled editorial.
>
> 2. All articles must be in good taste.
>
> 3. Any additional requirements set by the editor-in-chief.

While the requirement that "[a]ll articles must be in good taste" might indicate retention of control by the defendants of the *Gazette's* content, the overall thrust of the Rules and Regulations evidences placement of the paper's control into student hands. Given this, the Court finds that the *Gazette* represents a forum for public expression,

and that therefore the defendants must satisfy the Supreme Court's requirements for regulation of commercial speech.

## VI.

▪ Regulation of commercial speech is subject to the limitations set forth in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), as further refined in *Fox, supra*. In *Central Hudson*, the Supreme Court held that in evaluating the legality of commercial speech restrictions, such speech

> at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566, 100 S.Ct. at 2351. *Fox* establishes that the means chosen to advance the governmental interest need not be the least restrictive means, but rather must be "narrowly tailored to meet the desired objective." — U.S. at ——, 109 S.Ct. at 3035, 106 L.Ed.2d at 404. This Court's task, then, in evaluating the legality of advertising regulations, is to determine whether the defendants' asserted interest in prohibiting publication of the relevant advertisement is substantial, and if so, whether the means adopted in prohibiting its publication are narrowly tailored to meet the asserted interests.[4]

## VII.

▪ The dean, by affidavit, asserts that the college prohibited publication of the pertinent advertisement because it "was degrading to women, promoted drinking to students at the College not of legal drinking age, and was otherwise inimical to the educational mission of the College and the values the College seeks to promote in its publications." The Court cannot dispute the significance of the defendants' interest

**4.** The defendants in the current case do not assert that the advertisement either promoted illegal activity or contained misleading information.

in promoting educational values while objecting to the fostering of the degradation of women and underage drinking. In *Fox,* the Supreme Court found substantial the university's interests of promoting an educational atmosphere, preventing commercial exploitation, promoting safety and security, and preserving residential security, in weighing the legality of the university's ban on commercial advertising within student dormitories. —— U.S. at ——, 109 S.Ct. at 3032, 106 L.Ed.2d at 400. This Court therefore finds the defendants' interest in regulating the *Gazette's* advertising substantial.

The final issue, then, is whether the defenants' means for serving the above-stated interests are sufficiently narrowly tailored to pass first amendment scrutiny. Unlike the defendant in *Fox,* the present defendants have not promulgated any formal regulations addressing the *Gazette's* content. Rather, the dean contends that he is and has been for many years the final authority in deciding the content of the *Erie Square Gazette* "in instances where content is in controversy," and that on two prior occasions he has prevented publication of advertising "considered inappropriate." The plaintiff, in response, points to the fact that the *Gazette's* Rules and Regulations place content control into the Editor-in-Chief's hands, under the auspices of the Board of Authority, of which the dean is not a member. Furthermore, plaintiff urges, the Board of Control possesses no authority to regulate the *Gazette's* content, and therefore its action prohibiting publication of the relevant advertisement "was potentially unlawful." Plaintiff's Supplemental Brief at 3, n. 1.

In *Central Hudson, supra,* the Supreme Court directed that regulation of commercial speech "must be designed carefully to achieve the State's goal." 447 U.S. at 564, 100 S.Ct. at 2350. Thus, "[t]he regulatory technique may extend only as far as the interest it serves," and "[t]he State cannot regulate speech that poses no danger to the asserted state interest...." *Id.* at 565, 100 S.Ct. at 2351 (citations omitted). A review of the record in the instant case indicates that the asserted regulatory mechanism respecting the *Gazette's* content is anything but "carefully designed." Instead, the *Gazette* is subjected to the virtual unbridled regulatory authority of the dean and the Board of Control, entities that have provided no guidelines to the editors of the *Gazette* concerning the acceptability of certain forms of advertising for publication. As concisely stated in *Fox,* the Supreme Court has "insisted that ' "the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing ... the harmless from the harmful...." ' " 106 L.Ed.2d at 403, quoting *Shapero v. Kentucky Bar Assn.,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988) (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 646, 105 S.Ct. 2265, 2279, 85 L.Ed.2d 652 (1985)). The defendants herein have taken no formal effort to make such a distinction. Without such an effort, neither this Court nor the editors of the *Gazette* can evaluate whether the defendants' regulation on advertising " 'burden[s] substantially more speech than is necessary to further the government's legitimate interest.' " *Fox,* —— U.S. at ——, 109 S.Ct. at 3034, 106 L.Ed.2d at 402 (citations omitted). The Court therefore concludes that the defendants' regulation of advertising in the *Gazette* is not narrowly tailored to serve the defendants' interest, and that therefore the prohibition against publishing the advertisement at issue in this case violated the plaintiff's first amendment free speech rights.

## VIII.

Based upon the preceding, the Court GRANTS the plaintiff's motion for summary judgment, and DENIES the defendants' motion for summary judgment. The Court shall, at some future date, schedule a pretrial conference relating to the trial on plaintiff's damages.

IT IS SO ORDERED.