Luis Fernando Coss y la Universidad de Puerto Rico, demandantes y recurridos, *v.* Comisión Estatal de Elecciones, demandada y recurrente.

Número: RE-93-1          Resuelto: 8 de febrero de 1995

*David Rivé Rivera*, abogado de la parte recurrente; *Julio Ni-gaglioni Arrache, Eric R. Ronda Del Toro*, de *Ledesma, Palou & Miranda, Emilio Pena Fonseca* y *Manuel de J. González*, abogados de los recurridos.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

¿Puede la Comisión Estatal de Elecciones regular el contenido del mensuario[1] universitario *Diálogo*, en virtud de la prohibición de anuncios durante un año eleccionario, según el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, y la Sec. 2.1 del Reglamento de Gastos de Difusión Pública del Gobierno de 11 de diciembre de 1987 (en adelante Reglamento de Gastos)?

---

[1] "Periódico que se publica mensualmente. Mensual. No tiene registro académico, pero este neologismo es de formación correcta y de notoria necesidad en nuestra lengua. Por analogía, *monthly* en inglés; común adjetivo, significa *mensual*; y como sustantivo una revista o periódico que se publica una vez por mes." (Énfasis suplido.) D. Buonocore, *Diccionario de Bibliotecología*, 2da ed., Buenos Aires, Ed. Marymar, 1976, pág. 300.

# I

En septiembre de 1986 la Universidad de Puerto Rico comenzó su publicación que sería financiada con fondos propios y la venta de anuncios y suscripciones. Su Director, Sr. Luis Fernando Coss —por contrato— tiene a cargo la supervisión de los escritores, en su mayoría egresados de la Escuela de Comunicaciones de la Universidad, y el resto del personal. *Diálogo* mantiene sustancialmente un enfoque universitario y educativo sobre el quehacer cultural de Puerto Rico y del exterior. Entre sus colaboradores se encuentran profesores, estudiantes, empleados del sistema universitario y destacados escritores nacionales e internacionales.[2] Es utilizado como taller de práctica para los estudiantes de la mencionada Escuela. Cuenta, además, con personal técnico responsable de confeccionar las ediciones.

*Diálogo* produce una tirada de cuarenta mil (40,000) ejemplares que se distribuyen de forma gratuita durante el año académico a los estudiantes, profesores y empleados de todos los recintos de la Universidad de Puerto Rico y otras instituciones universitarias privadas del país.

Por otro lado, la independencia editorial de quienes confeccionan *Diálogo* nunca ha estado en duda. En su primera edición, el entonces Presidente de la Universidad de Puerto Rico, Lcdo. Fernando Agrait, dijo:

> Para facilitar el flujo de información, incrementar los niveles de conocimiento sobre nuestra propia realidad universitaria y para enseñarnos y enseñar a la comunidad puertorriqueña que la Universidad existe todos los días, surge este instrumento. *Diálogo no es un instrumento de la administración* para exponer su posición con respecto a temas que generen controversias; Diálogo es un esfuerzo por unir voluntades universitarias a[u]n

---

[2] Recientemente la Universidad de Puerto Rico acordó con la UNESCO la publicación en cada edición de *Diálogo* de una obra literaria de algún escritor reconocido de Iberoamérica.

cuando existan controversias. (Énfasis suplido.) *Diálogo* de septiembre de 1986, pág. 2; además, en declaración jurada del ex Presidente de la U.P.R., Dr. José M. Saldaña, anejada a la demanda, que confirma esta postura.

Al iniciarse el año eleccionario 1992, la Comisión Estatal de Elecciones comenzó a exigirle a las agencias del Gobierno el cumplimiento estricto con el mencionado Reglamento de Gastos. En específico, requirió al señor Coss que le sometiera —*antes de su publicación*— copias del mensuario para revisar que su contenido no incluyera anuncios prohibidos. El señor Coss decidió ignorar esos requerimientos y publicó sin someter las copias. Ante ello, la Junta de Anuncios de la Comisión Estatal de Elecciones emitió un informe el 13 de abril de 1992 y ordenó a la Universidad que cesara y desistiera esa publicación y anuncios hasta tanto obtuviera una autorización previa.

El 1ro de mayo de 1992 la Universidad de Puerto Rico y el señor Coss presentaron una demanda contra la Comisión Estatal en la que cuestionaron la validez y autoridad constitucional de esa orden. El Tribunal Superior, Sala de San Juan (Hon. Gilberto Gierbolini, hijo), ordenó a la Comisión Estatal que celebrara una vista, y retuvo jurisdicción. Celebrada, con el beneficio de memorandos de derecho de las partes, el 22 de junio de 1992 la Junta de Anuncios recomendó de forma unánime que se autorizara la publicación bajo las mismas condiciones impuestas en la Resolución de 13 de abril de 1992, es decir, siempre que se cumpliera a cabalidad con el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, y el Reglamento de Gastos. A esos fines, propuso que se ordenara a la Universidad a remitir, una vez publicado, desde agosto hasta noviembre de 1992, cuatro (4) copias de *Diálogo* a la Junta de Anuncios. El 1ro de julio de 1992 la Comisión Estatal aprobó dicho informe.

No conforme, tanto la Universidad de Puerto Rico como el señor Coss, volvieron y presentaron sendos recursos de revisión ante el mismo tribunal. Luego de una vista en cámara, el 21 de diciembre de 1992 dicho foro revocó la

sentencia por el fundamento de que *Diálogo* era un foro público con las mismas garantías y protecciones que gozan los demás periódicos de circulación en nuestra sociedad.

A solicitud de la Comisión Estatal de Elecciones revisamos.([3])

## II

La Comisión Estatal de Elecciones argumenta que la sentencia beneficia al señor Coss y no a la Universidad de Puerto Rico. Aduce que él es quien *únicamente* tiene legitimación activa para reclamar frente al Estado los derechos constitucionales en controversia aquí. No tiene razón.

■■■ El requisito de legitimación exige "la obligación de cerciorarnos de que las partes que suscitan la controversia están particularmente capacitadas para así hacerlo y de que su interés es uno 'de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia' ". *Noriega v. Hernández Colón*, 135 D.P.R. 406, 427 (1994), y casos allí citados. Con tal propósito, el promovente tiene que cumplir "con determinados requisitos indispensables, a saber: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso y no uno abstracto o hipotético; (3) que la causa de acción debe surgir bajo el palio de la Constitución o de una ley, y (4) que exista una conexión entre el daño sufrido y la causa de acción ejercitada". Íd.

■■■ Respecto a la prensa, hemos resuelto que los dueños y editores de un periódico tienen un interés espe-

---

([3]) Formulan así el planteamiento:

"Se plantea en este recurso si es inconstitucional que la Comisión Estatal de Elecciones —en años en que se celebran elecciones— le requiera a la Universidad de Puerto Rico que sus anuncios y publicaciones cumplan —durante este período— con las disposiciones pertinentes de la Ley Electoral y sus reglamentos." Caso Núm. RE-93-1, Parte I, Solicitud de revisión, pág. 4.

cial que los legitima para representarlo en los tribunales e invocar derechos a su favor. *Prensa Insular de P.R. v. Cordero, Auditor*, 67 D.P.R. 89, 102–103 (1947). Cuando el Estado crea un foro público, tiene que asegurarle a sus beneficiarios que los derechos constitucionales de libertad de expresión y de prensa no serán menoscabados salvo que la intervención gubernamental cumpla un escrutinio estricto. Además, si se violentan esos derechos, *sus beneficiarios son quienes pueden invocar la protección judicial.*

El señor Coss demandó por su condición de Director de *Diálogo, publicación de la Universidad de Puerto Rico.* Como usufructuarios de los derechos constitucionales de libertad de expresión y de prensa que protegen a *Diálogo*, ambos cumplen a cabalidad con los requisitos de legitimación activa para instar esta acción. Superado este aspecto procesal, concentrémonos en la sustancia del recurso.

### III

La pieza legislativa en que la Comisión Estatal de Elecciones fundamenta su intervención dispone:

> Se prohíbe *a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial,* que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos *para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes.* Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
>
> Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. (Énfasis suplido.) Art. 8 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351.

A su vez, la Sec. 2.1 del Reglamento de Gastos, págs. 4–5, ordena:

Toda agencia que, directa o indirectamente, proyecte incurrir en gastos en el uso de cualquier medio de difusión para emitir cualquier información que considere de interés público, tendrá que someter previamente una solicitud de autorización ante la Comisión.

Esta prohibición, aunque amplia, no es absoluta. Veda aquellos anuncios y aquellas publicaciones, directa e indirectamente, que de una u otra forma enaltecen o divulgan las ejecutorias del Gobierno. Según su historial legislativo, tiene el propósito de terminar "durante el período eleccionario la práctica de las agencias gubernamentales de hacer campaña política mediante la publicación de anuncios sobre sus logros y planes". *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 393 (1984).

Recientemente reiteramos ese enfoque en el contexto de unos anuncios para invitar a la ciudadanía a que celebre los actos oficiales conmemorativos del Día de la Constitución del Estado Libre Asociado de Puerto Rico sin el permiso correspondiente. *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993). A tal efecto dijimos que "del lenguaje suficientemente claro del propio Art. 8.001, *supra*, surge inequívocamente la intención legislativa de excluir definitivamente del proceso político la influencia solapada que el partido en el poder pueda tener, mediante el uso de los anuncios gubernamentales". *C.E.E. v. Depto. de Estado*, supra. Es claro, pues, que la validez del Art. 8.001, *supra*, respecto a publicaciones por las ramas de gobierno de *anuncios con matiz político-partidista* es absoluta y su validez no se cuestiona.

## IV

En el caso de autos, el tribunal sentenciador concluyó que *Diálogo* era un foro público de génesis estadual, al cual no se le podía limitar la expresión. Invocó a *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), a los

efectos de que "el Estado puede crear un periódico financiado con fondos públicos y convertirlo en un foro público". Sentencia de 21 de diciembre de 1992, pág. 2. El dictamen es de correcta juridicidad.

◼ El Art. II, Sec. 4 de nuestra Constitución, L.P.R.A., Tomo 1, consagra los derechos de libertad de prensa y de expresión como pilares fundamentales de esta sociedad democrática. La esencia de ambos derechos estriba en que el Estado no puede restringir de forma arbitraria el contenido de las publicaciones ni coartar la capacidad del ser humano para expresarse con libertad. *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229 (1988); *Aponte Martínez v. Lugo*, 100 D.P.R. 282 (1971); *Mari Bras v. Casañas*, 96 D.P.R. 15 (1968); *Pueblo v. Burgos*, 75 D.P.R. 551 (1953).

◼ La libertad de expresión es la quintaesencia de una sociedad democrática. De forma multidimensional, en la constelación de valores democráticos, goza de una primacía peculiar. Todo individuo está en libertad de poder expresar sus opiniones según su conciencia. Esta libertad intenta "proteger jurídicamente el libre desenvolvimiento de la personalidad a través de los medios más eficaces y habituales de exteriorización de los contenidos de conciencia". Escuela de Administración Pública, *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 205. Para lograr este fin, nuestra carta fundamental establece que no se aprobará ley alguna que restrinja la libertad de palabra o de prensa, o el derecho del pueblo a reunirse en asamblea pacífica y a pedir del Gobierno la reparación de agravios.

◼ Los derechos de libertad de expresión y de prensa no sólo protegen el contenido del mensaje, sino el medio y lugar donde se ejercite. Para delimitarlos, la jurisdicción federal desarrolló la doctrina de los foros públicos que acogimos en *Pacheco Fraticelli v. Cintrón Antonsanti*, supra, y

que reafirmamos en *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153 (1993).

A tales efectos, incorporamos la decisión de *Perry Ed. Assn. v. Perry Local Educator's Assn.*, 460 U.S. 37 (1983), en la cual el Tribunal Supremo federal reconoció por primera vez la existencia de tres (3) tipos de foros en los cuales el derecho de libertad de expresión disfruta de unas protecciones distintas.([4]) El *primero*, el foro público *tradicional*, radica en los lugares que el Estado haya reconocido históricamente como idóneos para el debate público y la reunión pacífica, tales como las calles, las aceras y los parques. En éstos no puede prohibirse absolutamente el derecho a la libertad de expresión, pero sí reglamentar el tiempo, lugar y modo de expresión siempre que la reglamentación sea neutral al contenido de la expresión y promueva un interés público apremiante, limite su intervención a la mínima necesaria y objetiva (*narrowly tailored*), y deje amplios medios de comunicación alternos. *Lee v. Krishna Society*, 505 U.S. 830 (1992); *Frisby v. Schultz*, 487 U.S. 474 (1988); *Perry Ed. Assn. v. Perry Local Educator's Assn.*, supra, pág. 44.

Si la reglamentación establece unas clasificaciones o limitaciones por razón del contenido del mensaje, entonces debe sobrepasar un *escrutinio estricto*. Es decir, responder a un interés gubernamental apremiante y limitar su interferencia a la mínima necesaria para alcanzar su objetivo. *Burson v. Freeman*, 504 U.S. 191 (1992).([5])

El *segundo* es el foro público por *designación*.

---

([4]) Se ha dicho que la frase "foro público" fue por primera vez utilizada por el Prof. Harry Kalven, Jr. en su artículo *The Concept of the Public Forum: Cox v. Louisiana*, 1965 S.Ct. Rev. 1. Véase *Nimmer on Freedom of Speech* Sec. 4.09[0] esc. 163, pág. 4–09 (1992).

([5]) Para casos federales que examinan la validez constitucional de reglamentaciones impuestas a publicaciones estudiantiles por oficiales de escuelas y universidades públicas, véase Anotación, *Validity, Under Federal Constitution, of Public School or State College Regulation of Student Newspapers, Magazines, or Other Publications—Federal Cases*, 16 A.L.R. Fed. 182 (1973).

Abarca los lugares no comprendidos en el foro público tradicional pero que hayan sido designados por el Estado para el ejercicio del derecho de la libertad de expresión. *La identificación de estos lugares dependerá de la intención del Estado al destinar la propiedad para determinados fines. Estos foros gozan de la misma protección que los públicos tradicionales.* Se abren "para propósitos específicos ... [y para beneficio de] ciertos grupos o sobre ciertos temas. ... [E]l derecho a expresarse se ext[iende] sólo a otros grupos de carácter similar o a otros puntos de vista sobre el mismo tema". *U.N.T.S. v. Srio. de Salud,* supra, pág. 164. En estos foros la reglamentación al derecho de expresión debe ser razonable.

El último foro es el *no tradicional,* que no está enmarcado dentro de los anteriores.

En ést[o]s, la protección que ofrece la Primera Enmienda de la Constitución federal es menor. El Gobierno puede limitar la actividad expres[a] a aquella compatible con el objetivo para el cual fue creada esta propiedad pública. La reglamentación de la expresión será válida siempre que sea razonable, aunque no tiene que ser la única ni la más razonable, ... neutral en cuanto a puntos de vista ... y siempre que no sea parte de un esfuerzo por suprimir la expresión .... *U.N.T.S. v. Srio. de Salud,* supra, pág. 164.

## V

En el ámbito de la prensa, la doctrina de los foros públicos ha sido extendida a periódicos subvencionados por escuelas públicas. El Estado o una institución educativa puede crear y subvencionar un periódico o una publicación, y clasificarlo como foro público por designación; así gozará de todas las garantías constitucionales de libertad de prensa y de expresión. R. Salomone, *Free Speech and School Governance in the Wake of Hazelwood,* 26 Ga. L. Rev. 253, 268 (1992); G. Danning, *Freedom of Speech in*

*Public Schools: Using Communication Analysis to Elimi-*
*nate the Role of Educational Ideology*, 19 Hastings Const.
L.Q. 123, 129 (1991); W.G. Buss, *School Newspapers, Pu-*
*blic Forum, and the First Ammendment*, 74 Iowa L. Rev.
505, 507 (1989); M.G. Yudof, *Personal Speech and Govern-*
*ment Expression*, 38 Case W. Res. L. Rev. 671, 680 (1988).
"Por ende, las facilidades educativas podrían considerarse
foros públicos, sólo si las autoridades escolares han— 'me-
diante política o por práctica'— abierto esas facilidades
'para el uso indiscriminado del público en general' *Perry*
*Education Assn. v. Perry Local Educator's Assn.*, supra,
pág. 47, o por algún segmento del público, tal como las
organizaciones estudiantiles". (Traducción nuestra.) *Haze-*
*lwood School District v. Kuhlmeier*, supra, pág. 467.

*Hazelwood School District v. Kuhlmeier*, supra, validó la
actuación del director de un periódico de escuela superior
al censurar unos artículos publicados *como parte de un*
*curso ofrecido de periodismo*. El director determinó que su
contenido no era apto para el público estudiantil al cual se
dirigía. El tribunal entendió que el periódico escolar había
sido creado como un taller de aprendizaje para los estu-
diantes del curso de periodismo y no como un foro para la
diseminación de ideas.([6]) No obstante, reafirmó lo resuelto
en *Cornelius v. NAACP Legal Defense & Ed. Fund*, 473
U.S. 788, 802 (1985) —a los efectos de que "el gobierno no
crea un foro público por inacción o permitiendo el discurso
limitado, sino sólo abriendo intencionalmente un foro no
tradicional para el discurso público" (traducción nuestra)—
y resolvió que de haber existido una intención clara de la
escuela de crear un foro público (*clear intent to create a*
*public forum*) para la diseminación indiscriminada de

---

([6]) En la Sec. 11 de la Anotación, *First Ammendment Rights of Free Speech and*
*Press as Applied to Public Schools—Supreme Court Cases*, 73 L.Ed.2d 1466, 1478
(1984), se analizan las razones por las cuales el periódico escolar no cualificaba como
un foro público.

890

ideas, el periódico hubiese gozado de las garantías constitucionales que protegen a esos foros.([7])

## VI

En la confección de *Diálogo* participan activamente profesores, estudiantes y reconocidos autores iberoamericanos. Los temas cubiertos en sus artículos varían desde aspectos de la vida universitaria hasta obras literarias. El propio informe de la Junta de Anuncios reconoció que "[u]n examen de los ejemplares sometidos a partir de enero de 1991 a mayo de 1992, demuestra que el periódico 'Diálogo' mantiene sustancialmente un enfoque universitario y educativo sobre el quehacer cultural universal y nacional". Informe de 22 de junio de 1992, pág. 3. Además, surgió de la prueba testifical:

> La manera en que se compile [D]iálogo no se diferencia mucho de cualquier otro periódico[,] se establece un plan monitorial a base de unas reuniones de tipo de redacción donde se toman en consideración los temas más sobresalientes del momento. Hay unas secciones naturalmente permanentes en la que participan académicos o personas asociadas al mundo de la cultura y la ciencia entre otros han participado como colaboradores Luis Rafael Sánchez, José Luis González, Ana Lydia [Vega], Magaly García Ram[i]s, Arcadio Díaz Quiñones, entre algunos científicos José Miguel García Castro, Manuel Gómez, la corporación de estudios de ingeniería de la U.P.R. y las universidades privadas, han participado también investigadores prominentes de

---

([7]) La Universidad invoca *Mississippi Gay Alliance v. Goudelock*, 536 F.2d 1073 (5to Cir. 1976), que resolvió que la negativa del editor de un periódico de una universidad estatal publicar los anuncios de la organización demandante violaba los derechos garantizados por la Primera Enmienda. Además, nos cita *Lueth v. St. County Clair Community College*, 732 F. Supp. 1410 (E.D. Mich. 1990), en que la Corte de Distrito dictaminó que el periódico universitario constituía un foro público y, por ende, el Decano de la institución no podía prohibir la publicación de un anuncio de un club de bailarinas nocturnas, pues atentaba contra los derechos de expresión del editor del periódico.

En esa misma sintonía, anotamos *San Diego Committee v. Governing Bd.*, 790 F.2d 1471 (9no Cir. 1986), en que la Corte de Apelaciones expresó que la decisión de una junta escolar de prohibir la publicación de un anuncio en oposición al servicio militar violaba la Primera Enmienda por ser el periódico un foro público.

la Estación Experimental como ustedes saben es una dependencia de la Universidad y escritores del exterior, entre otros, García Márquez, Alfredo [Bryce Echenique,] [Camilo José Cela] y otros. T.E., Vista de 4 de mayo de 1992 ante la Junta de Anuncios de la Comisión Estatal, págs. 53–54.

Dicha prueba también demostró que su contenido editorial es seleccionado *exclusivamente* por su editor, señor Coss, y un equipo de redactores; *la administración no participa en este proceso.* Apuntaló el señor Coss en la vista oral ante la Junta de Anuncios lo siguiente:

> ... [L]a administración universitaria naturalmente es parte de la comunidad y también su iniciativa o ejecutorias son propuestas de temas periodísticos pero esto se evalúa con total y absoluta independencia por parte del equipo y Redacción, la Coordinadora de Redacción y el Director. T.E., *supra*, pág. 60.

Resulta claro, pues, que *Diálogo* es un foro público por *designación*, lo que implica examinar si la reglamentación impuesta sobrepasa el análisis del escrutinio estricto. Es decir, la restricción gubernamental tiene que responder a un interés gubernamental apremiante y constituir una intervención mínima para lograr sus objetivos.

Del alegato de la Comisión Estatal no surge evidencia suficiente que demuestre que, al aplicarse el citado Art. 8.001 al mensuario *Diálogo*, se promovió algún interés gubernamental apremiante. Aunque el propósito de la Ley Electoral de Puerto Rico es evitar que los poderes gubernamentales utilicen los fondos públicos para realizar campañas políticas durante años eleccionarios, y ello constituye un interés legítimo, en este caso, no es apremiante. *Diálogo* no es un medio que atente contra el propósito codificado; por el contrario, tiene un enfoque amplio universitario y académico que no cae dentro del marco limitante del susodicho Art. 8.001.

En conclusión, resolvemos que *Diálogo* constituye un foro público creado por el Estado que no está sujeto al escrutinio de la Junta de Anuncios de la Comisión Estatal de

Elecciones. El derecho constitucional a la libertad de expresión y de prensa protegen a la Universidad de Puerto Rico y al señor Coss, en beneficio de *Diálogo*, contra intervenciones de este tipo.

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Hernández Denton emitió una opinión concurrente. El Juez Asociado Señor Fuster Berlingeri concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Rebollo López emitió una opinión disidente.

— O —

Opinión concurrente del Juez Asociado Señor Hernández Denton.

Mediante un recurso de revisión comparece ante nos la Comisión Estatal de Elecciones (en adelante C.E.E.) y solicita que revoquemos una sentencia del Tribunal Superior, Sala de San Juan, que dispone que el periódico universitario *Diálogo* constituye un foro público con garantías idénticas a los demás periódicos de circulación general, por lo que el Reglamento de Gastos de Difusión Pública del Gobierno (en adelante Reglamento) no le aplica.([1]) La mayoría de este Tribunal hoy confirma dicho dictamen. Por entender que, al reglamentar la compra de tiempo y espacio en los medios de difusión pública, el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, no quiso referirse a publicaciones universitarias tales como *Diálogo*,

---

([1]) Dicho reglamento, creado por virtud de los poderes cuasilegislativos concedídosle a la Comisión Estatal de Elecciones (C.E.E.) por los Arts. 1.005 y 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3013 y 3351, exige que "[t]oda agencia que, directa o indirectamente, proyecte incurrir en gastos en el uso de cualquier medio de difusión para emitir cualquier información que considere de interés público ... somet[a] previamente una solicitud de autorización ante la Comisión". Sec. 2.1 del Reglamento de Gastos de Difusión Pública del Gobierno (en adelante Reglamento), págs. 4–5.

y que al hacer extensiva su aplicación a tales publicaciones el Reglamento es *ultra vires*, concurrimos.

## I

A principios del año electoral 1992, la C.E.E. comenzó a exigirle a todas las agencias de gobierno que cumplieran con su Reglamento, aprobado por los tres (3) partidos políticos en noviembre de 1991. Como la Universidad de Puerto Rico no sometió su mensuario *Diálogo* a la C.E.E., esta última emitió un informe ordenándole que cesara y desistiera de publicar y anunciar el periódico hasta tanto no cumpliera con los requisitos del Reglamento.

A raíz de ello, la Universidad de Puerto Rico presentó, en unión al director de *Diálogo*, Luis Fernando Coss, una demanda de *injunction* para paralizar las actuaciones de la C.E.E. El Tribunal Superior devolvió el caso a la Junta de Anuncios para que ésta celebrase una vista evidenciaria. Como resultado de ésta, la Junta concluyó que *Diálogo* tenía la obligación de cumplir con lo dispuesto en el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, así como con el Reglamento.

Luego de evaluar el recurso de revisión presentado por los demandantes, el Tribunal Superior revocó la determinación de la Junta de Anuncios. Concluyó que *Diálogo* era un foro público al cual no se le podía restringir la expresión, por lo cual el Reglamento no le podía aplicar. La mayoría de este Tribunal confirma dicho dictamen. Concurrimos por entender que las publicaciones universitarias con propósitos académicos, tales como *Diálogo*, deben estar exentas de este tipo de reglamentación, y que fue precisamente ésta la intención del legislador al redactar el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*. Por tal razón, no consideramos necesario evaluar la aplicabilidad o el alcance de la doctrina del foro público a *Diálogo* o a

cualquier otra publicación que sea sufragada con fondos públicos por la Universidad de Puerto Rico.

## II

La controversia del caso de autos se reduce en esencia a si el Reglamento aplica a periódicos con propósitos didácticos o académicos como *Diálogo*. La resolución de dicha controversia requiere que examinemos no tan sólo el propósito detrás de la adopción del Reglamento, sino también el del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, en cuyas disposiciones se fundamenta dicho reglamento.

El Art. 8.001 dispone lo siguiente:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública *con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes*. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
>
> Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. (Énfasis suplido.) 16 L.P.R.A. sec. 3351.

Nuestra jurisprudencia ha sido clara al expresar que el propósito del Art. 8.001, *supra*, es muy limitado. En *P.P.D. v. Junta Revisora Electoral*, 109 D.P.R. 464 (1980), por ejemplo, este Tribunal se negó a expedir un auto de revisión por entender que la publicación, en los periódicos de circulación general, de una invitación a celebrar el Día de Reyes en Fortaleza no constituía un gasto " 'con el propósito de exponer ... programas, proyectos, logros, realizaciones, proyecciones o planes' " del Gobierno. (Énfasis suprimido.) Íd., pág. 465. Del mismo modo, en *Romero Bar-*

*celó v. Hernández Agosto*, 115 D.P.R. 368 (1984), expresamos que televisar un procedimiento parlamentario no representaba la exposición de " 'programas, proyectos, logros, realizaciones, proyecciones o planes' ". Íd., pág. 392. Añadimos que "[l]a divulgación de los procedimientos legislativos cumple un propósito de estirpe constitucional, claramente distinguible del proselitismo que anima la propaganda electoral. La ley se refiere más bien a anuncios y propaganda sobre tales programas, logros, etc". Íd.

Más adelante, en *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993), dispusimos que tanto del texto del citado Art. 8.001 como de su intención legislativa surgía con claridad que el propósito de dicha disposición fue "excluir ... del proceso político la influencia solapada que el partido en el poder pueda tener mediante el uso de los anuncios gubernamentales". Íd., pág. 939.

Finalmente, en *P.P.D. v. Gobernador II*, 136 D.P.R. 916, 926 (1994), dispusimos que "[e]l concepto de igualdad económica, con relación a la distribución de fondos públicos en el proceso electoral, impide que un partido que ostente el poder de gobernar al pueblo en un momento dado utilice fondos públicos para tomar ventaja indebida dirigida a promover su postura. El Art. 8.001, *supra*, es precisamente una medida preventiva para que no ocurra dicha práctica indebida".

En fin, al examinar la letra y el propósito del Art. 8.001, *supra*, este Tribunal ha determinado constantemente que su aplicación se limita a aquellos anuncios y propaganda que se difundan "con el propósito de exponer los programas, proyectos, logros, realizaciones, proyecciones o planes" del gobierno de turno. Íd.

Dicha determinación inevitablemente nos lleva a concluir que el Reglamento es *ultra vires*. Al disponer que toda agencia que "proyecte incurrir en gastos en el uso de *cualquier* medio de difusión para emitir *cualquier* información que considere de interés público" (énfasis suplido), el Re-

glamento va más allá que el referido Art. 8.001.(²) Éste sobrepasa inclusive lo dispuesto en su propia declaración de propósitos, que limita sus fines a lo expuesto en el Art. 8.001, *supra*, es decir, a "evitar la divulgación publicitaria indiscriminada con el propósito de exponer ... programas, proyectos, logros, realizaciones, proyecciones o planes del gobierno que en alguna forma coaccionen o afecten la voluntad de los electores".(³)

Resultaría excesivo oneroso aplicar la veda electoral a toda publicación universitaria con propósitos académicos como, por ejemplo, *Diálogo*; la Revista Jurídica de la Escuela de Derecho o su periódico *Entredicho*; la Revista de Ciencias Sociales del Centro de Investigaciones Sociales o la Revista de Estudios Hispánicos. Ello atentaría contra los principios más básicos de la libertad académica, libertad de cátedra y autonomía universitaria, que buscan brindarle resguardo a las universidades contra los esfuerzos gubernamentales de controlar o dirigir el contenido de la expresión en las universidades o, más bien, el discurso universitario. *C.E.S. U.P.R. v. Gobernador*, 137 D.P.R. 83 (1994).

Resulta patente que, dado el contenido de estas publicaciones universitarias, el interés en proteger a la comunidad contra la saturación de propaganda gubernamental durante el período eleccionario no se adelantaría en proporción al costo de implantar el Art. 8.001, *supra*, según la interpretación amplia de éste, hecha por el Reglamento. *Diálogo* constituye una publicación académica seria que, como admite la misma C.E.E., mantiene sustancialmente un enfoque universitario y educativo sobre el quehacer cultural universal y nacional. Para muchos de sus colaboradores —entre ellos profesores universitarios— *Diálogo* constituye una continuación de la cátedra. Un periódico de

---

(²) Sec. 2.1 del Reglamento, *supra*, págs. 4–5. Véase esc. 1 de esta opinión para una lectura del texto íntegro de esta sección.

(³) Sección 1.2 del Reglamento, *supra*, pág. 1.

la excelencia de *Diálogo*, según ha sido administrado hasta ahora, no pone en peligro el derecho al sufragio libre de coacción ni constituye una erogación injusta de fondos públicos. Por lo tanto, no debe aplicarle el Art. 8.001, *supra.*

No queremos decir con esto que queden exentas de la veda electoral las publicaciones universitarias que pretendan difundir los logros y proyectos del Gobierno en un año electoral. Tampoco quedan exentos los anuncios que publiquen otras agencias de gobierno, con el mismo propósito, en dichos medios de difusión. Nuestra posición en este caso se fundamenta en el hecho de que se ha pretendido tratar a una publicación universitaria de índole académica como propaganda gubernamental.

Por todo lo anterior, concurrimos con la confirmación de la sentencia recurrida.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Nos vemos obligados a *disentir* en el presente caso. Lo más "fácil" hubiera sido no hacerlo; ello debido al hecho de que, dados los hechos particulares del caso, la posición disidente que sostenemos no resulta ser la más "simpática". *La función judicial, sin embargo, no puede regirse por consideraciones de esa naturaleza.*

Disentimos debido al hecho de que somos del firme criterio que la opinión mayoritaria emitida en el presente recurso no sólo es una *errónea en derecho* sino que la misma constituye un *peligroso precedente* en nuestra jurisdicción. La citada decisión "abre las puertas", y constituye "carta blanca", para que el clima de politización extrema que desafortunadamente prevalece en nuestro País pueda acrecentarse, y agravarse, aún más.

Ello en vista del hecho de que la norma jurídica hoy

implantada por la referida opinión mayoritaria tiene el potencial de permitir que muchas de las agencias, corporaciones e instrumentalidades públicas del Gobierno de Puerto Rico establezcan periódicos o publicaciones, análogas al mensuario universitario *Diálogo,* las cuales podrán ser impunemente utilizadas por la administración de gobierno, *de turno en un momento determinado de nuestra historia,* para "exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes",([1]) *aun durante años eleccionarios.*

I

Como surge de la opinión mayoritaria emitida, el mensuario universitario *Diálogo* fue creado por la Escuela de Comunicaciones de la Universidad de Puerto Rico durante el 1986. Su personal, y principales colaboradores, está compuesto —en su inmensa mayoría— por estudiantes, profesores y empleados de la referida Escuela de Comunicaciones; siendo su director, el codemandante Luis Fernando Coss, un empleado *por contrato* de la Universidad. *Diálogo* es distribuido, *en forma gratuita,* entre los estudiantes, empleados y profesores de *todos* los recintos de la Universidad de Puerto Rico. El mismo es sufragado con fondos públicos y es utilizado —en palabras de la propia mayoría— "como un *taller de práctica* para los estudiantes de la mencionada Escuela" de Comunicaciones de la Universidad de Puerto Rico. (Énfasis suplido.)

De lo expuesto *surge con claridad que "Diálogo" es un apéndice de la Escuela de Comunicaciones de la Universidad, el cual fue creado para beneficio de los estudiantes de dicha Escuela.* Dicho de la manera más sencilla, y examinado el asunto desde la perspectiva más objetiva e imparcial posible, *"Diálogo" no es otra cosa que un "laboratorio"*

---

([1]) Véase Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351.

*en el cual los estudiantes y profesores de la mencionada Escuela de Comunicaciones practican o ponen en vigor las enseñanzas que se imparten, y que se reciben, en la misma*; laboratorio similar o análogo a los relativos a otras disciplinas que se enseñan en la Universidad de Puerto Rico.

## II

*No* discrepamos de la aseveración, contenida en la opinión mayoritaria, pág. 886, a los efectos de que la "libertad de expresión es la quintaesencia de una sociedad democrática", *como tampoco* del hecho de que una prensa, libre y objetiva, constituye uno de los requisitos indispensables, o pilares fundamentales, de una sociedad democrática como la nuestra. *De hecho, hemos sido "celosos guardianes" de la libertad de prensa.* Nuestras decisiones al respecto constituyen la mejor evidencia de ello.

*Ahora bien,* aquí realmente *no* nos enfrentamos a una situación en que el Estado pretende censurar o amordazar a un periódico o publicación privada. Se trata, *repetimos,* de un "taller de práctica" o laboratorio de la Escuela de Comunicaciones de la Universidad de Puerto Rico; *la cual institución universitaria, independientemente de cómo se le clasifique, cuando menos es una corporación pública o una "criatura" del Estado.*(²) Por otro lado, estamos conscientes de las bien intencionadas palabras expresadas por el Presidente de la Universidad, al crearse *Diálogo,* a los efectos de que dicha publicación gozaría de "independencia editorial".

Ante dicha situación fáctica, *¿puede aseverarse con corrección que dicho mensuario ha sido "designado" por el Estado como un foro público?*

No hay duda de que, a la luz de la jurisprudencia fede-

---

(²) En *Sepúlveda v. U.P.R.*, 115 D.P.R. 526, 527 (1984), expresamos que la Universidad es "una corporación pública, de génesis legislativa, encargada de la educación superior en Puerto Rico".

ral pertinente,(³) puede argumentarse a favor o en contra de la posición de que *Diálogo* es un "foro público por designación". *Por otro lado,* parece ser igualmente debatible la posición a los efectos de si una publicación de la Escuela de Comunicaciones de la Universidad de Puerto Rico —*la cual, repetimos, fue creada con el propósito principal de que los estudiantes de dicha Escuela puedan practicar lo que aprenden en la misma*— cualifica o no como "beneficiaria" de la protección que le concede *a la "prensa"* la Sec. 4 del Art. II de la Constitución de Puerto Rico, L.P.R.A., Tomo 1.

### III

*Ahora bien, para la correcta solución del recurso ante nuestra consideración, dichas interrogantes no tienen que ser contestadas.* Ello así ya que, aun *asumiendo* a los fines de la argumentación que *Diálogo* haya sido "designado" como foro público por el Estado y/o que el mismo efectivamente sea beneficiario de la protección que confiere la Sec. 4 del Art. II de la Constitución, ante, *somos del criterio que la aplicación a "Diálogo",* por la Comisión Estatal de Elecciones de las disposiciones del citado Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, y de la Sec. 2.1 del Reglamento de Gastos de Difusión Pública del Gobierno de 11 de diciembre de 1987, págs. 4–5, *resiste y sobrepasa el "criterio de escrutinio estricto" que debe ser aplicado en esta clase de situaciones.* Véase *U.N.T.S. v. Srio. de Salud,* 133 D.P.R. 153 (1993).

*Existe, no hay duda, un "interés gubernamental apremiante" de parte del Estado de mantener y preservar, lo más incólume posible y libre de influencias indebidas, el ejercicio del derecho al sufragio en nuestra jurisdicción.*

---

(³) Desafortunadamente nuestra jurisprudencia está huérfana de expresiones al respecto. Ello nos obliga a acudir a la jurisprudencia federal.

Véase *P.P.D. v. Gobernador II*, 136 D.P.R. 916 (1994). Como este Tribunal expresara en el antes mencionado caso: " '[t]anto nuestro ordenamiento constitucional como el norteamericano han reconocido a cabalidad *la condición fundamental y preeminente del derecho al sufragio*' "; derecho que *"es consustancial con la existencia misma de la democracia"*. (Énfasis suplido y en el original.) Íd., pág. 926, citando a *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445 (1993). Ello así ya que, *en las sabias e ilustrativas palabras del Tribunal Supremo Federal*, el derecho al sufragio "preserva todos los demás derechos". (Traducción nuestra.)[4]

Resulta mandatoria, en consecuencia, la conclusión a los efectos de que el "derecho de libertad de prensa" que *pueda tener* el mensuario *Diálogo* —apéndice o laboratorio de la Escuela de Comunicaciones de la Universidad de Puerto Rico— *debe y tiene que ceder ante el "interés apremiante" que tiene el Estado de mantener las elecciones generales que cada cuatro (4) años se celebran en el País lo más libre posible de propaganda e influencia política indebida.*[5]

Lo procedente en derecho, *por ende*, sería que este Tribunal *revocara* la sentencia recurrida por el fundamento de que el Estado tiene un "interés gubernamental apremiante" —*salvaguardar la pureza del derecho al sufragio*— que *válidamente* le permite a la Comisión Estatal de Elecciones *regular el contenido del mensuario "Diálogo" durante el año en que se celebran las elecciones generales en nuestro País*; ello al amparo de lo dispuesto por el citado Art. 8.001 de la Ley Electoral de Puerto Rico.

---

[4] *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

[5] En cuanto al codemandante Luis Fernando Coss, el cual es un empleado *por contrato* de la Universidad de Puerto Rico, éste *no* puede tener mayores derechos que los que tiene *Diálogo* o la Universidad de Puerto Rico respecto al derecho de "libertad de prensa" garantizado por la Constitución.

## IV

*Pero, aun hay más.* La peligrosidad de la errónea norma hoy implantada por el Tribunal *no* tiene límite. No obstante ser los primeros en aceptar que, hasta el día de hoy y hasta donde conocemos, *Diálogo* no ha sido utilizado con fines político-partidistas, *procede que nos preguntemos*: ¿qué garantías hay de que las personas que hoy, o mañana, controlan la Universidad de Puerto Rico no utilicen dicha publicación como un instrumento indebido de propaganda política? La contestación en la negativa resulta ser obvia. Ahora bien, ello *no* es lo realmente crucial en este asunto.

Lo verdaderamente importante lo son las *implicaciones* que tiene la errónea norma que hoy se establece por el Tribunal. Si una corporación pública como la Universidad de Puerto Rico tiene derecho —meramente debido al hecho que el Presidente de la misma "garantice" su imparcialidad editorial— a publicar un mensuario sin que la Comisión Estatal de Elecciones pueda pasar juicio sobre la imparcialidad y corrección, desde un punto de vista de propoganda política indebida, de su contenido en un año eleccionario, *¿qué impide que otras agencias o corporaciones públicas del Gobierno hagan lo mismo durante el año de 1996 o en años eleccionarios subsiguientes?*

Esto es, la opinión emitida abre las puertas para que cualquier jefe de una corporación pública pueda anunciar, con bombos y platillos, la creación de una publicación la cual, conforme sus palabras en ese momento, no será utilizada por dicha corporación pública como instrumento del Gobierno para difundir los supuestos logros del mismo. Dicha actuación o "garantía verbal", *conforme la opinión emitida*, será suficiente para convertir a dicha publicación en un "foro público por designación", el cual estará inmune de fiscalización por la Junta de Anuncios de la Comisión Estatal de Elecciones.

## V

En síntesis, disentimos debido al hecho de que *no* podemos refrendar una opinión que establece un *erróneo* y *peligroso* precedente en nuestra jurisdicción, el cual, al gravemente afectar y lastimar el derecho al sufragio, resulta igualmente perjudicial para nuestro sistema democrático de gobierno.