EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Oficina de Ética Gubernamental<br><br>Recurrida<br><br>v.<br><br>Manuel B. Martínez Giraud<br><br>Peticionario | Certiorari<br><br>2022 TSPR 93<br><br>209 DPR ____ |

Número del Caso: CC-2021-65

Fecha: 7 de julio de 2022

Tribunal de Apelaciones:

> Panel Especial

Abogada de la parte peticionaria:

> Lcda. Yarlene Jiménez Rosario

Abogadas de la parte recurrida:

> Lcda. Michelle Marie Vélez Berríos
> Lcda. Reyna M. Tejeda Cordero
> Lcda. Massiel I. Hernández Tolentino
> Lcda. Vilma L. Vega Rodríguez

Materia: Derecho Administrativo – Infracción al Artículo 4.2(s) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico es individual e independiente de cualquier otro artículo de la ley; estándar probatorio para establecer la infracción al Artículo 4.2(s).

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Oficina de Ética Gubernamental<br><br>Recurrida<br><br>v.<br><br>Manuel B. Martínez Giraud<br>Peticionario | CC-2021-0065 | *Certiorari* |

**El Juez Asociado Señor Rivera García emitió la Opinión del Tribunal.**

En San Juan, Puerto Rico, a 7 de julio de 2022.

En esta ocasión tenemos la oportunidad de precisar los contornos de la *Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico*, infra, y el alcance del Artículo 4.2(s) del mencionado estatuto, el cual prohíbe a un servidor público realizar acciones que pongan en duda la imparcialidad e integridad de la función gubernamental.

Somos conscientes de la importancia que tiene la función preventiva y fiscalizadora de la Oficina de Ética Gubernamental, sin embargo, las determinaciones adjudicativas que realice esta agencia no pueden estar sustentadas en inferencias, conjeturas, ni en percepciones creadas por denuncias mediáticas que actúan como influencia externa. Así, en aras de evitar el

automatismo adjudicativo al justipreciar imputaciones éticas sobre empleados públicos, y con el fin de fortalecer el análisis sobre estas, establecemos que se requiere satisfacer un estándar probatorio **claro, robusto y convincente**, de manera tal, que produzca en el juzgador una convicción permanente de que los asuntos fácticos son altamente probables. Solo de esta forma nos aseguramos de que la amplitud con la que puede ser interpretado el Artículo 4.2(s) de esta legislación, no se preste para castigar escenarios que puedan ser tergiversados o que, de alguna manera, se alejen de la verdad jurídica. De igual forma, este debe ser el *quantum* probatorio requerido para penalizar cualquier infracción ética bajo esta ley. De paso, recalcamos la norma hartamente conocida sobre que la apariencia de impropiedad, por sí sola, jamás conllevará automáticamente que se encuentre a un funcionario incurso en una violación ética.

Además, aprovechamos la oportunidad para señalar que una infracción al Artículo 4.2(s), es individual e independiente de cualquier otro artículo de la misma ley, de manera que su consecución no está atada a si se infringió o no algún otro artículo relacionado.

Así, por entender que el Tribunal de Apelaciones erró al confirmar que el peticionario infringió la disposición ética estatuida en el Artículo 4.2(s) de la Ley de Ética Gubernamental, *infra*, revocamos.

**I**

El 14 de agosto de 2018, la Oficina de Ética Gubernamental (OEG o recurrida) presentó una *Querella* contra el Sr. Manuel B. Martínez Giraud (señor Martínez Giraud o peticionario), en la que le imputó una violación al inciso (s) del Artículo 4.2,[1] y al inciso (c) del Artículo 4.4,[2] ambos de la Ley 1-2012, conocida como Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico.[3] En esencia, la querella responsabilizó al peticionario, quien era Juez Administrativo del Departamento de Asuntos del Consumidor (DACo) en la región de Arecibo, de haber ofrecido asesoría a un empleado de Power Sport Warehouse (PSW) con relación a los casos en los que este comercio figuraba como querellado ante dicha agencia, los cuales ascendían a 275 tras el paso del Huracán María. La *Querella* imputó, además, que los actos del peticionario pusieron en duda la imparcialidad e integridad de la agencia.[4] Como parte de lo alegado, se detalló que **el peticionario acudía al mencionado comercio como cliente en su carácter privado** y no como funcionario público, pues compraba *go karts*, piezas para estos y había realizado gestiones sobre un

---

[1] 3 LPRA secc. 1857a. "Un servidor público no puede llevar a cabo una acción que ponga en duda la imparcialidad e integridad de la función gubernamental".

[2] 3 LPRA secc. 1857c. "Un servidor público no puede, en su carácter privado, representar o asesorar, directa o indirectamente, a una persona privada o negocio ante cualquier agencia, en casos o asuntos que involucren un conflicto de intereses o de política pública entre el Gobierno y los intereses de esa persona privada o negocio".

[3] 3 LPRA sec. 1854 *et seq.*

[4] Apéndice de la Petición de *Certiorari*, Anejo IV, págs. 77-81.

generador eléctrico. Asimismo, la *Querella* señaló que, durante una de estas visitas, el peticionario fue grabado ─sin su consentimiento─ mientras se encontraba con la Sra. Elma Santiago Aquino (señora Santiago Aquino). Esta última, era una de las personas que atendían asuntos de PSW ante el DACo. La aludida grabación fue posteriormente transmitida por televisión como parte de un reportaje de "Telemundo Responde".

Por su parte, el 29 de agosto de 2018, el peticionario presentó una alegación responsiva en la que negó las imputaciones en su contra y señaló que nunca asesoró a PSW respecto a los casos que estaban ante la consideración del DACo. Además, sostuvo que el video grabado por uno de los empleados a escondidas era ilegal, pues no otorgó consentimiento alguno para ello.[5]

Así las cosas, la OEG celebró una vista administrativa durante los días 26 de febrero de 2019 y 27 de marzo de 2019. Durante estas, la OEG presentó los siguientes testigos: Sra. Lumarie Figueroa Hernaiz, Sr. Jean Paul Hernández Padilla, la Sra. Yimaris Rosado Serra, la Sra. Coralis Cora González, la Sra. Norma Iris Román Rosa y el Sr. José Juan Sánchez Álvarez (señor Sánchez Álvarez). Por su parte, el peticionario presentó a la señora Santiago Aquino y el Sr. José O. Alicea Barreto.

---

[5] Íd., Anejo VI, págs. 84-88.

Luego de examinar la prueba oral y documental, la Oficial Examinadora a cargo del caso sometió su *Informe*.[6] En este, **concluyó que la OEG no presentó prueba suficiente sobre el contenido de las conversaciones entre el peticionario y la señora Santiago Aquino para demostrar que este proveyó asesoría** respecto a algún asunto pendiente ante la agencia. Hizo constar, también, que **el peticionario <u>no atendió ni presidió ninguna de las 275 querellas presentadas contra PSW</u>**. No obstante, señaló que el reportaje en el que se reseñó el encuentro del peticionario con la señora Santiago Aquino provocó que el señor Sánchez Álvarez llegara a la conclusión que los jueces administrativos de DACo estaban parcializados y que su caso en contra de PSW estaba perdido. Basado en lo anterior, el 21 de noviembre de 2019, la OEG emitió una *Resolución* en la que desestimó la querella contra el peticionario respecto a la imputación sobre el artículo 4.4(c) de la Ley de Ética Gubernamental, *supra*. Sobre la imputación referente al Artículo 4.2(s), la OEG determinó que este infringió tal disposición y le impuso una multa administrativa de $8,000 dólares.[7]

Subsiguientemente, el peticionario solicitó reconsideración ante la agencia administrativa, pero esta

---

[6] Íd., Anejo VI, págs. 56-66.
[7] Íd., Anejo VI, págs. 53-55.

que denegada mediante una *Resolución* notificada el 12 de diciembre de 2019.[8]

Inconforme, el 13 de enero de 2020, el señor Martínez Giraud presentó un recurso de revisión administrativa ante el Tribunal de Apelaciones. Allí, arguyó que el foro administrativo erró al encontrarlo incurso en el Artículo 4.2(s) y al imponerle una multa, a pesar de que no se demostró que ofreció asesoría al comercio y que el vídeo sobre el cual se sostenía la querella y las alegaciones no formó parte de la prueba presentada. Por ello, entendió que la determinación de que incurrió en conducta impropia era insostenible.

Posteriormente, el 17 de diciembre de 2020, el tribunal intermedio emitió una *Sentencia* en la que confirmó la decisión recurrida por entender que el dictamen administrativo era razonable a la luz de la prueba desfilada. Reza la *Sentencia*, como conclusión de derecho, que

> "una vez la OEG establece los hechos, que dan lugar a una querella, (la infracción al inciso (s) del artículo 4.2), **le corresponde al funcionario público demostrar** que su conducta no puso en duda la imparcialidad e integridad de la función de la agencia que representa. El peso de la prueba, lo tiene el funcionario, ya que está en la mejor posición de presentar prueba documental y/o testifical, que demuestre que sólo se trató de una mera apariencia de conflicto, sin más, dentro del contexto y del momento en que ocurrieron los hechos. **Si el funcionario público no logra derrotar las imputaciones de la OEG, que**

---

[8] Íd., Anejo VI, págs. 74-76.

**dieron lugar a la querella, se constituye la violación a la Ley de Ética Gubernamental**".[9]

Más adelante, concluyó que el peticionario "**nunca demostró mediante prueba preponderante que sus actuaciones no crearon la percepción pública de falta de confianza e imparcialidad** en las funciones del puesto que ocupa".[10]

Insatisfecho, el señor Martínez Giraud acude ante nos mediante recurso de *Certiorari*, y alega que el foro apelativo cometió el error siguiente:

> Erró el Honorable Tribunal de Apelaciones al confirmar la resolución dictada por la Oficina de Ética Gubernamental y concluir que el recurrente incurrió en violación al artículo 4.2(s), no empece la Oficina de Ética haber desestimado correctamente la alegación sobre violación al artículo 4.4(c) de la Ley 1-2012 y no empecé no haber desfilado prueba sobre la conducta imputada toda vez que ni el reportaje televisivo ni el video sobre el cual se sostiene la querella formó parte de la prueba presentada ante la consideración del foro administrativo.

En consideración al error planteado, el 30 de abril de 2021 emitimos una *Resolución* en la que determinamos expedir el auto solicitado. Consecuentemente, el 5 de agosto de 2021 la OEG presentó el *Alegato de la Parte Recurrida*.

---

[9] Apéndice de la Petición de *Certiorari*, Anejo I, pág. 10.
[10] Apéndice de la Petición de *Certiorari*, Anejo I, pág. 27.

De esta forma, contando con el beneficio de la comparecencia de ambas partes, nos encontramos en posición de resolver.

## II

### A. Revisión Judicial

Es norma conocida que las determinaciones emitidas por las agencias administrativas están sujetas a un proceso de revisión judicial ante el Tribunal de Apelaciones.[11] Conforme con ello, la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), autoriza expresamente la revisión de las decisiones, órdenes y resoluciones finales de estos organismos.[12] El objetivo de la revisión judicial es asegurar que los organismos administrativos actúen conforme a las facultades concedidas por ley.[13] Para esto, los tribunales revisores debemos conceder deferencia a las decisiones de las agencias administrativas, pues estas gozan de experiencia y conocimiento especializado sobre los asuntos ante su consideración, lo cual ampara sus dictámenes con una presunción de legalidad y corrección que subsiste mientras no se produzca

---

[11] <u>AAA v. UIA</u>, 200 DPR 903, 910 (2018); Art. 4.006(c) de la Ley Núm. 201-2003 Ley de la Judicatura, 4 LPRA sec. 24y.

[12] Sec. 4.6 de la Ley Núm. 38-2017, Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, 3 LPRA sec. 9676.

[13] <u>Pérez López v. Departamento de Corrección y Rehabilitación</u>, 2022 TSPR 10 (2022); <u>Torres Rivera v. Policía de PR</u>, 196 DPR 606, 625-626 (2016). Véase, además, D. Fernández Quiñones, <u>Derecho administrativo y Ley de Procedimiento Administrativo Uniforme</u>, 3ra ed., Bogotá, Ed. Forum, 2013, pág. 669.

suficiente prueba para derrotarla.[14] Por ende, la parte que impugna judicialmente las determinaciones de hechos de una agencia administrativa tiene el peso de la prueba para demostrar que estas no están basadas en el expediente **o que las conclusiones a las que llegó la agencia son irrazonables**.[15]

Ahora bien, el criterio rector al momento de pasar juicio sobre la decisión de un foro administrativo es la **razonabilidad** de la actuación de la agencia.[16] Así pues, la revisión judicial estará limitada a evaluar si la agencia actuó de manera arbitraria, ilegal o irrazonable, de manera tal que sus acciones constituyeron un abuso de discreción.[17]

De esta forma, el alcance del proceso de revisión se ciñe a determinar: 1) si el remedio concedido por la agencia fue el apropiado; 2) si las determinaciones de hecho de la agencia están basadas en evidencia sustancial que obra en el expediente administrativo; y 3) si las conclusiones de derecho fueron las correctas.[18] Hasta tanto no se demuestre mediante evidencia suficiente que la presunción de legalidad ha sido superada o invalidada,

---

[14] Capó Cruz v. Junta de Planificación et al., 204 DPR 581 (2020); Torres Rivera v. Policía de PR, *supra*, pág. 626. Véase, además, Batista, Nobbe v. Jta. Directores, 185 DPR 206, 215 (2012).

[15] OCS v. Universal, 187 DPR 164, 178-179 (2012); González Segarra v. CFSE, 188 DPR 252, 276-278 (2013).

[16] Torres Rivera v. Policía de PR, *supra*, pág. 627; Otero v. Toyota, 163 DPR 716, 727 (2005).

[17] Torres Rivera v. Policía de PR, *supra*, pág. 626.

[18] Íd., *supra*, pág. 627.

el respeto hacia la resolución administrativa debe sostenerse.[19]

En sentido similar, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme (LPAU),[20] establece que "[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo". Este criterio de evidencia sustancial lo que busca es "evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor".[21] Así, pues, evidencia sustancial ha sido definida jurisprudencialmente como aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión.[22] **Sin embargo, esta acepción no podrá estar sostenida por un ligero destello de evidencia o por simples inferencias.** Así, el criterio rector en estos casos siempre estará guiado por la **razonabilidad** de la determinación administrativa luego de considerar el **expediente administrativo en su totalidad.**

Por su parte, las determinaciones de derecho serán revisables en todos sus aspectos. Si bien la doctrina opera dentro de un marco de deferencia, en particular, cuando se trata de aquellas leyes y reglamentos que le

---

[19] Íd.; Capo Cruz v. Junta de Planificación, 204 DPR 581 (2020).
[20] 3 LPRA sec. 9675.
[21] Torres Rivera v. Policía de PR, *supra*, pág. 627.
[22] Batista, Nobbe v. Jta. Directores, *supra*, pág. 216.

corresponde a la agencia poner en vigor, esta cede si la agencia "(1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales".[23]

Así, el criterio administrativo no podrá prevalecer cuando la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrarios al propósito para el cual se aprobó la legislación y la política pública que promueve. En ese sentido, la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia.[24]

## B. Ley de Ética Gubernamental

La Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley 1-2012, según enmendada,[25] es el estatuto regente de la conducta de los servidores y exservidores públicos de la Rama Ejecutiva.[26] Esta legislación va dirigida a establecer un servicio público íntegro, con valores, que mantenga la confianza en sus instituciones y asegure la transparencia en las funciones oficiales. Tiene como misión, entre otras, educar al

---

[23] Íd., pág. 628.

[24] Moreno Lorenzo y otros v. Departamento de la Familia, 2021 TSPR 109 (2021).

[25] 3 LPRA secc. 1854 *et seq*.

[26] Art. 4.1 de la Ley de Ética Gubernamental, 3 LPRA sec. 1857.

servidor público para que, en el desempeño de sus funciones, exhiba los valores de bondad, confiabilidad, justicia, responsabilidad, respeto y civismo que rigen la administración pública.[27] Así, el objetivo principal de esta legislación es renovar y reafirmar la función preventiva y fiscalizadora que realiza la OEG.[28]

En cuanto a la figura del servidor público, el Artículo 1.2 de la precitada Ley lo define como la "persona en el Gobierno que interviene en la formulación e implantación de la política pública o no, aunque desempeñe su encomienda permanente o temporalmente, con o sin remuneración".[29]

Por otro lado, para reafirmar el carácter preventivo y correctivo que tiene esta ley, se le delegó a la OEG la facultad de imponer sanciones a los infractores de sus disposiciones. Respecto a ello, el Artículo 4.7 dispone que toda persona que viole las disposiciones de la Ley de Ética Gubernamental y todo reglamento u orden promulgada por virtud de la referida ley, será castigada con una multa administrativa que no excederá de $20,000 por cada violación.[30] De igual forma, provee para que la violación de cualquiera de las disposiciones de ese Capítulo, pueda ser castigada con la suspensión sumaria de empleo,

---

[27] Artículo 2.1, Ley de Ética Gubernamental, 3 LPRA sec. 1855.
[28] Véase, Exposición de Motivos de la Ley de Ética Gubernamental.
[29] 3 LPRA sec. 1854.
[30] 3 LPRA sec. 1857f.

**suspensión de empleo y sueldo o <u>con la destitución o despido</u>.**

En lo atinente a nuestro caso, el Artículo 4.4(c) de la Ley de Ética Gubernamental,[31] dispone que un servidor público no puede, en su carácter privado, representar o asesorar, directa o indirectamente, a una persona privada o negocio ante cualquier agencia, en casos o asuntos que involucren un conflicto de intereses o de política pública entre el Gobierno y los intereses de esa persona privada o negocio.

Por su parte, el Artículo 4.2 de la Ley de Ética establece una serie de prohibiciones éticas de carácter general. De manera textual, el inciso (s) de este artículo establece que "[u]n servidor público no puede llevar a cabo una acción que ponga en duda la imparcialidad e integridad de la función gubernamental".[32] Es decir, penaliza la acción que crea una percepción o apariencia de conducta impropia y deshonestidad en las funciones gubernamentales.

## C. Función adjudicativa de las agencias administrativas

En aras de fiscalizar la conducta de los servidores públicos y penalizar a todos los que transgredan normas éticas que envuelvan los valores en el servicio público, la OEG, al igual que otras agencias administrativas,

---

[31] 3 LPRA sec. 1857c.
[32] 3 LPRA sec. 1857a.

lleva a cabo funciones adjudicativas consistentes en decidir casos y controversias aplicando a los hechos la normativa legal pertinente.[33] En ese sentido, este tipo de funciones representa una marcada semejanza con los procedimientos tradicionales utilizados por los tribunales de justicia para decidir los asuntos ante su consideración.

Es norma conocida que los procedimientos disciplinarios en el foro administrativo, generalmente, no se rigen por los mismos criterios probatorios que los casos criminales en los tribunales. De ordinario, el *quantum* de prueba necesario para prevalecer en el ámbito administrativo es el de preponderancia de la prueba.[34] Sin embargo, los procedimientos administrativos que suponen violaciones a disposiciones éticas deben ser atendidos a través de un crisol más riguroso. En comparación con los procedimientos éticos que aquí discutimos, las imputaciones al amparo de los Cánones de Ética Profesional,[35] requieren que la prueba sea aquilatada a la luz del estándar de prueba clara, robusta y convincente.[36] Lo anterior, bajo el supuesto de que, en los procesos contra los abogados, está en juego su título y, por ende, el derecho fundamental a ganarse su sustento.

---

[33] 3 LPRA secc. 1854 *et seq*.

[34] Trib. Exam. Méd. v. Cañas Rivas, 154 DPR 29, 36-37 (2001).

[35] 4 LPRA Ap. IX.

[36] Véanse, In re Candelaria Rosa, 197 DPR 445, 459 (2017)(*Per curiam*); In re Quiñones Artau, 193 DPR 356, 386 (2015)(*Per curiam*); In re Muñoz, Morell, 182 DPR 738, 750 (2011) (*Per curiam*).

En ese sentido, la prueba clara, robusta y convincente es un estándar intermedio de suficiencia de la prueba que, en esencia, es más exigente que el comúnmente aplicado estándar de preponderancia de la prueba en casos civiles, pero que, a su vez, es menos riguroso que la prueba establecida más allá de duda razonable. Si bien es cierto que el referido estándar no es susceptible de ser definido de forma precisa, hemos descrito la prueba clara, robusta y convincente como aquella evidencia que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables.[37] Nótese, además, que aunque se trate de una mera apariencia, el cargo ético debe quedar establecido por prueba clara y convincente, **no afectada por reglas de exclusión ni a base de conjeturas**.

## III

El señor Martínez Giraud sostiene, en esencia, que la determinación de la OEG de encontrarlo incurso en el inciso (s) del artículo 4.2 de la Ley de Ética Gubernamental, *supra*, es errónea, toda vez que no se presentó prueba sustancial que reflejara que este había realizado acciones que ponían en duda la imparcialidad de la agencia administrativa para la cual trabajaba —*como lo sería el video del reportaje de televisión*— y porque,

---

[37] Señala el Profesor Ernesto Chiesa, "[e]ste estándar se usa cuando está por el medio un derecho demasiado fundamental para permitir ser afectado por la sola preponderancia de la evidencia". E.L. Chiesa Aponte, Reglas de Evidencia Comentadas, Ediciones SITUM, 2016, págs. 51-52.

además, no se tomó en consideración que la propia OEG desestimó la alegación sobre la violación al artículo 4.4(c) por falta de prueba que demostrara, en efecto, el acto imputado.

Por su parte, la OEG arguye que su decisión se basó en la evidencia sustancial que obraba en el expediente administrativo oficial, y que se encuentra dentro del marco de la discreción y conocimiento especializado de la OEG. Señala, además, que el encuentro del peticionario con personal de PSW generó serias dudas sobre la imparcialidad e integridad del DACo, acción punible bajo las disposiciones de la Ley de Ética Gubernamental, *supra*.

Ahora bien, previo a disponer de la controversia medular de autos, es necesario establecer que las disposiciones estatuidas en los Artículos 4.2(s) y 4.4(c) de la Ley de Ética Gubernamental, *supra*, son separadas e independientes una de otra. Por ello, la conducta tipificada en el Artículo 4.2(s) no está sujeta a que se quebrante, como infracción base, alguna otra disposición del mencionado estatuto. Es decir, una persona puede cometer una violación al artículo 4.2(s) sin necesariamente haber infringido algún otro artículo, como lo sería en nuestro caso el artículo 4.4(c). Sobre este particular, es un hecho incontrovertido que la OEG no demostró que el peticionario infringió el artículo 4.4(c) de la Ley de Ética Gubernamental, *supra*, toda vez que no

pudo probar que el peticionario proveyó asesoría a un comercio privado respecto a algún asunto pendiente ante la agencia. **La agencia reconoció que la prueba presentada, más allá de establecer que el peticionario y la persona que realizaba labores para PSW hablaron en el área de trabajo de esta, "<u>no estableció</u> de qué hablaron para demostrar que, en efecto, hubo alguna asesoría por parte del querellado".**[38] También, concluyó que la prueba testimonial de la querellante estuvo basada en **"inferencias y especulaciones".**[39] Por lo tanto, la querella respecto al artículo 4.4(c) fue correctamente desestimada. Sin embargo, subsistió la infracción imputada en lo que respecta al artículo 4.2(s).

Establecido lo anterior, resta entonces preguntarnos, ¿incurrió en conducta impropia el señor Martínez Giraud según tipificada por el artículo 4.2(s) de la ley antes mencionada? **<u>Contestamos en la negativa</u>**. Nos explicamos.

El lenguaje que expresa el artículo 4.2(s) de la Ley de Ética Gubernamental, *supra*, penaliza el hecho de que un servidor público lleve a cabo acciones que pongan en duda la imparcialidad e integridad de la función gubernamental. Esta expresión, en esencia, está dirigida a sancionar aquellas acciones que aparenten perjudicar, o de alguna manera estropear, la confianza del público en sus instituciones gubernamentales.

---

[38] Informe final de la Oficial Examinadora de OEG, pág. 64.
[39] Íd.

Ahora bien, **no cualquier conducta** que aparente representar un conflicto ético o una incompatibilidad con las funciones gubernamentales de un empleado público, **por sí sola, debe ser considerada como una infracción punible bajo esta disposición.** Esto es así, pues la amplitud con la que puede ser interpretada una prohibición de este tipo no puede representar, en lo absoluto, una carta blanca para que la mínima percepción sea procesada y castigada, sin tomar en consideración la totalidad de la prueba y sin eliminar el peso de factores externos que puedan incidir directamente sobre el asunto.

Y es que, los procedimientos administrativos que impliquen violaciones éticas, por su particular naturaleza, suponen aquilatar la prueba desde una óptica más rigurosa y exigente que la mera preponderancia de prueba. De acuerdo con ello, y en lo que respecta a las homólogas imputaciones bajo los Cánones de Ética Profesional, *supra*, hemos reiterado en múltiples ocasiones que el estándar intermedio de prueba **clara, robusta y convincente** es el requerido por nuestro ordenamiento ético disciplinario para imponer sanciones bajo este cuerpo normativo.[40] Lo anterior, se estableció bajo el supuesto de que está en juego el derecho fundamental a ganarse un sustento.

En la controversia de autos, **no se puede exigir menos**, máxime, cuando la naturaleza del procedimiento es

---

[40] Véanse, <u>In re Candelaria Rosa</u>, *supra*; <u>In re Quiñones Artau</u>, *supra*; <u>In re Muñoz, Morell</u>, *supra*.

una acusatoria, en la que el empleado público al cual se le imputa infringir una norma ética, se encuentra presto a ser castigado con una multa sustancial o con el despido de su empleo. Como podemos apreciar, tal escenario no dista mucho de los estudiados por este foro en acciones de corte ético-disciplinario contra profesionales del derecho. Por ello, es forzoso concluir que cuando se cuestione el comportamiento ético de un funcionario público, así sea la simple apariencia de imparcialidad o deshonestidad, **el cargo debe quedar establecido mediante prueba clara, robusta y convincente que, a su vez, supere y descarte todos los planteamientos basados en conjeturas y en relatos de terceros.**

Ahora bien, el Tribunal de Apelaciones, como conclusión de derecho, señaló que "*una vez la OEG establece los hechos que dan lugar a una querella... le corresponde al empleado público demostrar que su conducta no puso en duda la imparcialidad e integridad*" de la gestión gubernamental, de manera que el peso de la prueba recae en la parte querellada "*ya que está en mejor posición*" de demostrar que sólo se trató de una mera apariencia. **No podemos aceptar tal aseveración.** Es un principio reconocido que, de ordinario, el peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia, o quien sostiene la afirmativa en el asunto en controversia.[41] De esta forma, aquel que

---

[41] 32 LPRA Ap. VI, R. 110.

busca de un remedio o sanción en el ámbito administrativo, al igual que en el judicial, tiene que probar su caso. Es decir, tiene que evidenciar con prueba suficiente en derecho, que sus alegaciones no constituyen meros señalamientos, sino un reclamo cierto y sostenible. Lo contrario, atentaría contra los principios más elementales de justicia.

En nuestro caso, la propia OEG fue quien formuló y presentó la querella en contra del peticionario, por consiguiente, recaía sobre este organismo el deber de probar lo alegado al examinador o juzgador de acuerdo con el estándar de suficiencia requerido. Establecer que el funcionario público tiene que derrotar las imputaciones establecidas por la OEG para evitar ser encontrado incurso en una violación ética, bajo el pretexto de que se encuentra en mejor posición de presentar prueba documental que rebata las alegaciones, resultaría en un absurdo, por lo que **es totalmente improcedente.**

De hecho, este mismo caso nos ejemplifica lo anterior, pues, **la OEG <u>desestimó</u> la causa en cuanto al Artículo 4.4(c) sobre el supuesto asesoramiento al comercio privado porque, precisamente, la agencia administrativa no probó los elementos básicos de la infracción imputada, toda vez que la prueba destinada a esos fines fue totalmente especulativa.**

A fin de cuentas, la función adjudicativa que realiza la OEG está enmarcada dentro de un procedimiento

cuasi-penal en el que el querellado se enfrenta a un **procedimiento adversarial** que puede implicar, si resulta incurso en los cargos imputados y en su acepción más benevolente, en una multa cuantiosa, o en un peor escenario, en la destitución de su empleo. Por ello, reiteramos, que la carga probatoria no puede recaer, bajo ningún concepto, en el querellado.

Establecido lo anterior, examinemos varias razones por las cuales concluimos que la determinación de la OEG resulta irrazonable e insostenible a la luz de lo que aquí resolvemos. Como veremos, resulta evidente que la determinación del organismo administrativo respondió a un ejercicio automático y alejado de lo que refleja la totalidad integral del expediente.

Surge de la prueba que el señor Martínez Giraud era cliente habitual de PSW **desde antes del año 2016**, y que allí adquirió vehículos *go karts*, así como varias piezas para este tipo de transporte. Además, surge que, debido a sus continuas compras en PSW, el señor Martínez Giraud **era conocido por muchos de los empleados de este comercio y tratado con mucha afabilidad.**

Para el año 2017, el local de PSW constaba de un salón de exposición y ventas (*showroom*) y un área administrativa. Respecto al *showroom*, este era el espacio donde regularmente se recibían y atendían a los clientes. Mientras, que el área administrativa era el lugar destinado para manejar los asuntos de dirección y

gerencia del comercio. No obstante, si bien es cierto que el acceso al área administrativa estaba supuesto para el personal adscrito a esa zona, **era común que personas que no eran parte del área administrativa de PSW, o que ni siquiera fueran empleados de PSW entraran al área administrativa**.[42] A dicha área entraban vendedores, suplidores y <u>**hasta clientes**</u>. Sobre estos últimos, surge que entraban los clientes en las instancias siguientes: cuando tenían que hacer algún tipo de transacción sustancial en efectivo o cuando la venta fuese sobre los diez mil dólares ($10,000), cuando esperaban por algún equipo, mercancía o cuando aguardaban por algún tipo de servicio.[43] Lo anterior, porque al momento de los presuntos hechos, carecían de espacio adicional destinado como un área de espera formal.[44] De igual forma, surge que **el área administrativa era un <u>espacio abierto, visible a todo el mundo -incluso clientes- en el que coexistían varios empleados administrativos</u>**, es decir, era un <u>**espacio compartido**</u> **entre varios empleados que no era de acceso, ni uso exclusivo por la señora Santiago Aquino**.[45] De esta forma, quedó claro que el lugar donde fue grabado el peticionario **no era uno privado, escondido y mucho menos discreto**. De hecho, al señor Martínez Giraud, quien fue identificado como alguien que acudía con alguna

---

[42] Apendice de la Peticion de *Certiorari*, *Transcripción de la Prueba Oral*, págs. 440-442.

[43] Íd.

[44] Íd., pág. 442.

[45] Íd., págs. 381, 439, 446.

frecuencia al comercio **en su carácter privado**, **nunca se le llamó la atención por estar en el área administrativa.**

De igual forma, la prueba testifical demostró dos particularidades que son de extrema importancia para la controversia que hoy atendemos. En primer lugar, que **de las 275 querellas presentadas** contra PSW ante el DACo posterior al Huracán María, **el peticionario no presidió, ni atendió, ninguna de estas**. En segundo lugar, que las declaraciones concernientes a que el señor Martínez Giraud discutió con el personal de PSW asuntos y casos pendientes ante el DACo, **fueron simplemente inferencias personales y conjeturas, pues no se tenía conocimiento real ni personal de lo que realmente estaban hablando las personas reunidas**. Durante el contrainterrogatorio, se le preguntó a la Sra. Coralis Cora González, con relación a lo que vio en el video, **si ella asumió** que el peticionario y el personal de PSW estaban discutiendo casos del DACo. **Su respuesta fue en la afirmativa**. Posteriormente, en el redirecto, y respondiendo la pregunta sobre cuál era la intervención que ella conocía del peticionario, esta respondió que "*dándole, pues sugerencias, **puede haber sido** su… pues, **le pudo** haber estado dando sugerencias, cómo trabajarlos, de qué manera trabajarlos, etcétera*". Ante este lenguaje especulativo, la Oficial Examinadora le cuestionó si "**¿eso es una inferencia que usted hace?**", y la respuesta de la testigo

fue: "**correcto**".[46] De hecho, esta conclusión fue sostenida por el *Informe de la Oficial Examinadora*[47] y por la *Sentencia* del Foro Intermedio.

Por otro lado, la Sra. Lumarie Figueroa Hernaiz (señora Figueroa Hernaiz), testigo de la propia OEG, aceptó que el video difundido en Telemundo Responde estuvo editado en ciertas partes.[48] Por su parte, la Sra. Norma Iris Román Rosa, testigo también presentada por la OEG, expresó que, con relación a la percepción del video, estaba "**acostumbrad[a] a este tipo de programa. A eso es a lo que se han dedicado, a difamar la agencia; siempre ha sido así. Lo que buscan es hacerle daño a la agencia**".[49]

Por otra parte, nos resulta muy preocupante lo manifestado por uno de los testigos de la OEG en cuanto a la intención de por qué los empleados de PSW decidieron grabar a escondidas al peticionario. Y es que, según declaró la señora Figueroa Hernaiz, varios empleados de PSW —ella incluida— **presentaron una demanda contra el propio PSW** para reclamar el pago de comisiones, salarios, otros beneficios laborales y daños. Como parte de este proceso, crearon un '*chat* de *WhatsApp*' en el que compartían asuntos relacionados al proceso legal **y del**

---

[46] Apéndice de la Petición de *Certiorari*, *Transcripción de la Prueba Oral*, págs. 414-415.

[47] Apéndice de la Petición de *Certiorari*, *Informe de la Oficial Examinadora* de OEG, págs. 56-66.

[48] Apéndice de la petición de *Certiorari*, *Transcripción de la Prueba Oral*, págs. 600-601.

[49] Apéndice de la petición de *Certiorari*, *Transcripción de la Prueba Oral*, pag. 616.

**cual era parte la representante legal del grupo**. Declaró que uno de los demandantes decidió grabar la interacción, compartirla en el 'chat' privado, y que fue **la propia abogada de ellos quien hizo los arreglos con la reportera de Telemundo para que llevara a cabo la entrevista con la testigo para que se discutiera públicamente el asunto**. A preguntas de por qué la entrevistaron a ella, mencionó que eso lo "**hace la licenciada López Mulero debido al sinnúmero de casos que ella también tenía con unos clientes que estaba llevando los casos para jurado. Y ella lo tomó, verdad, como prueba para los casos de ella**".[50]

Lo anterior, además de representar una acción delicada por la influencia que podía tener el reportaje o la entrevista —impulsada o concertada por la propia abogada de los testigos— en potenciales jurados de otros casos contra PSW. Esto, claramente pone de manifiesto que la grabación de la entrevista sobre el video en cuestión tenía el interés de adelantar una causa particular interpuesta mediante una demanda civil,[51] previa a los hechos que aquí nos conciernen, so pretexto de hacer justicia para terceros. Claramente, este hecho particular pone de relieve la parcialidad y motivación, no solo en sus testimonios, sino en su actuar previo. Es decir, surgen fuertes indicaciones de que los testimonios

---

[50] Apéndice de la petición de *Certiorari*, *Transcripción de la Prueba Oral*, págs. 558-601.

[51] Caso civil, SJ-2018CV0613.

vertidos ante la agencia pueden obedecer a motivos menos nobles. De igual forma, mancillan el trasfondo y la objetividad del reportaje televisivo.

De otro lado, tanto la determinación de la agencia, como la del foro intermedio, estuvieron basadas en el testimonio del señor Sánchez Álvarez, quien alegó que observó el video difundido a través de "Telemundo Responde" y pensó que su caso ante el DACo estaba perdido porque allí se "truqueaban" las querellas. Lo cierto es que, tal como aceptó el propio testigo, **su generador eléctrico <u>fue reparado</u> desde el 11 de noviembre de 2017**, es decir, un día después de haberse querellado ante el DACo y mucho tiempo antes de que se difundiera el video en televisión local. Como vemos, **el problema principal** ——equipo dañado—— por el cual el testigo formuló la querella en la agencia, **era un asunto que PSW había <u>resuelto</u> meses antes de que se difundiera el video, e incluso, de que se refiriera el asunto a la OEG.** Así, el DACo actuó correctamente al desestimar la querella en el momento que la atendió. El consumidor, bien pudo haber solicitado revisión de la determinación administrativa si entendía que medió algún tipo de fraude o manejo indebido, pero este rechazó apelar porque "estaba molesto". Cabe reiterar, que el testigo pretendía que el DACo determinara que le correspondía otro equipo o la devolución del dinero sin tener presente que el equipo le había sido reparado y era funcional desde el año

anterior, en un patente ejercicio de deshonestidad intelectual.

Contrario a los foros inferiores, no nos parece que la mera impresión del señor Sánchez Álvarez sea suficiente para sancionar al peticionario, especialmente, cuando esta fue causada por un reportaje televisivo unilateral, y que, según surgió de los testimonios, estaba editado. Además, establecemos que la apariencia de parcialidad o deshonestidad que penaliza el Artículo 4.2(s) de la Ley de Ética Gubernamental, *supra*, tiene que estar sostenida sobre una robusta impresión dada al público de una acción antiética. Esa fuerte impresión no quedó establecida con la prueba desfilada en este caso.

Podemos entender que la percepción de un individuo sea un proceso individual y de conciencia. No obstante, cuando la percepción sobre una situación particular **es creada por la narrativa de un tercero**, entonces, estamos ante la posibilidad de un sentir **distorsionado, tergiversado o influenciado**. En ese sentido, descansar exclusivamente en la declaración del testigo **sin tener la oportunidad de observar ni discernir lo que realmente se grabó, su contexto, ni lo que posteriormente se difundió en el reportaje** de "Telemundo Responde", es una acción irrazonable que descansa en un ejercicio automatizado y que se distancia de lo que tantas veces hemos repudiado sobre que la apariencia de impropiedad, por sí sola, jamás podrá conllevar automáticamente que se encuentre a

un funcionario incurso en una violación ética. El contexto del video y del reportaje, dadas las circunstancias particulares del caso, era un elemento indispensable que tenía que sopesar la OEG en su análisis, en vista de evitar que los empleados públicos pudieran ser sancionados por interpretaciones tergiversadas de su conducta. No podemos ceder nuestro criterio ciegamente ante la presunta apreciación de la prueba del juzgador administrativo, cuando resulta evidente que la prueba fue examinada sin el contexto que permitiría justipreciarla efectivamente.

Aprovechamos la coyuntura de la discusión para destacar varios apuntes referentes a los medios de comunicación y la libertad de prensa. Nuestra Constitución, al igual que la Constitución federal, consagra la libertad de prensa como un derecho fundamental el cual impide la restricción arbitraria del contenido de publicaciones, así como el medio, lugar y manera en que se realicen, no importa su veracidad, popularidad o simpatía.[52] Esto es así, pues, el ejercicio de la libertad de palabra y prensa no depende de que lo que se diga o publique sea cierto. De igual forma, esta libertad no puede coartarse en aras de evitar un escándalo, ya que persigue un interés social de promover una discusión franca y enérgica de los asuntos públicos.[53]

---

[52] Véanse, Enmda. I, Const. EE.UU., LPRA, Tomo 1; Art. II, Sec. 4, Const. PR, LPRA, Tomo 1; Coss y U.P.R. v. C.E.E., 137 DPR 877 (1995).
[53] Véase, Meléndez Vega v. El Vocero De PR, 189 DPR 123, 220 (2013).

Ciertamente, los medios de comunicación tradicionales, así como los de vanguardia, representan la forma más efectiva de informar y notificar a la sociedad los hechos o acontecimientos que suceden de la manera que estimen necesaria.

Ahora bien, también es una realidad que los medios de comunicación ejercen un rol importante como forjadores de opinión y poseen una marcada capacidad para influir, desde su óptica editorial, la percepción general dado a su extenso alcance social. Por ello, cuando se ejerzan funciones adjudicativas basadas en reportajes, programas, segmentos, artículos, columnas, entre otros, producidos por algún medio de comunicación, mas no así en el conocimiento personal de los declarantes, los testimonios de estos tendrán que ser examinados con gran cautela. El sensacionalismo mediático no puede nublar la razonabilidad con la que se tienen que atender este tipo de asuntos. En ese sentido, la prueba para demostrar un acto sancionable bajo el artículo en cuestión **no puede descansar, en lo absoluto, en la percepción que pueda haber creado un medio de comunicación** sobre una persona en particular.

De este modo, el análisis sobre la apariencia que penaliza la Ley de Ética Gubernamental, *supra*, **tiene que eliminar toda presión externa que pueda haber influido** en el discernimiento cognitivo del individuo, como en este caso lo fue el reportaje de televisión en la persona del

señor Sánchez Álvarez. Tenemos que tener presente que, al momento de evaluar y aquilatar la prueba, las meras alegaciones, imputaciones, señalamientos o denuncias esbozadas en los medios de comunicación no constituyen lo que conocemos como la verdad jurídica. Esta es la verdad que tiene que ser demostrada en el proceso adversarial adjudicativo. Sencillamente, en los dictámenes administrativos, al igual que en los judiciales, no existe cabida al prejuicio, a la parcialidad, ni a la pasión como pudiera ocurrir en lo que podemos denominar como el juicio del pueblo, el cual se realiza fuera de las instituciones correspondientes.

En fin, la realidad es que, de un examen integral y ponderado del expediente, resulta irrazonable encontrar al señor Martínez Giraud incurso en una violación al Artículo 4.2(s) de la ley de Ética Gubernamental, *supra*. Estamos convencidos que la prueba desfilada estuvo **fundada en inferencias y conjeturas promovidas y matizadas por un interés particular, así como también, por vigorosas influencias externas manifestadas en un reportaje y en un video que nunca se presentó en evidencia y que nunca se pudo evaluar.** Reiteramos, que la apariencia de impropiedad, por sí sola, jamás conllevará automáticamente que se encuentre a un funcionario incurso en una violación ética. Era deber de la agencia promovente presentar prueba clara, robusta y convincente sobre los actos presuntamente cometidos por el

peticionario y no descansar en meras especulaciones para probar la apariencia de impropiedad. Esto no contradice el estándar de revisión fundado en la razonabilidad del dictamen, siempre que este se encuentre sostenido en evidencia sustancial que obre en el expediente, pues el *quantum* de la prueba requerida en una vista para dilucidar violaciones éticas es distinto al estándar de revisión que rige al foro judicial cuando pasa juicio sobre la decisión final de la agencia. En vista de ello, entendemos que no se demostró que el señor Martínez Giraud violó el Artículo 4.2(s) de la Ley de Ética Gubernamental, *supra*.

**IV**

Por los fundamentos aquí señalados, revocamos el dictamen emitido por el Tribunal de Apelaciones y, consecuentemente, dejamos sin efecto la multa de $8,000.00 impuesta por la Oficina de Ética Gubernamental al peticionario.

Se dictará sentencia de conformidad.


Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Oficina de Ética Gubernamental<br><br>Recurrida<br><br>v.<br><br>Manuel B. Martínez Giraud<br><br>Peticionario | CC-2021-0065 | *Certiorari* |

**SENTENCIA**

En San Juan, Puerto Rico, a 7 de julio de 2022.

Por los fundamentos expuestos en la Opinión que antecede, la que se hace formar parte íntegra de la presente Sentencia, se revoca la Sentencia del Tribunal de Apelaciones y, consecuentemente, dejamos sin efecto la multa de $8,000.00 impuesta por la Oficina de Ética Gubernamental al peticionario.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez disiente sin opinión escrita. El Juez Asociado señor Colón Pérez disiente con opinión escrita a la cual se une la Jueza Presidenta Oronoz Rodríguez.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

    Recurrida

      v.                    CC-2021-0065

Manuel B. Martínez Giraud

    Peticionario

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ a la cual se une la Jueza Presidenta ORONOZ RODRÍGUEZ.

En San Juan, Puerto Rico, a 7 de julio de 2022.

En el presente caso nos correspondía determinar si el Tribunal de Apelaciones había errado al confirmar cierta *Resolución* dictada por la Oficina de Ética Gubernamental, mediante la cual dicho ente administrativo concluyó que el Sr. Manuel B. Martínez Giraud infringió el Art. 4.2(s) de la Ley de Ética Gubernamental de Puerto Rico de 2011, *infra*, por lo que le impuso a éste una multa de $8,000.00.

Hoy, al realizar dicho análisis, una mayoría de este Tribunal, -- en un ejercicio en extremo forzado y lejos de ceñirse a las formas en que, de ordinario, ejerce su función revisora de una determinación administrativa, -- al revocar al foro apelativo

intermedio, resuelve que la Oficina de Ética Gubernamental estaba obligada a satisfacer un **estándar de prueba clara, robusta y convincente** para sostener que el referido servidor público incurrió en la violación ética imputada. Es decir, más allá de la revisión judicial de la determinación administrativa que tenía ante sí, una mayoría de mis compañeros y compañera de estrado se centra en pautar un nuevo estándar probatorio para casos como el de epígrafe; los cuales, históricamente, -- en el foro administrativo -- se habían resuelto bajo el **estándar de preponderancia de la prueba**. De dicho proceder, respetuosamente disentimos. Veamos.

I.

Los hechos medulares que dieron margen al presente litigio no están en controversia. Allá para el 14 de agosto de 2018, la Oficina de Ética Gubernamental presentó una *Querella* en contra del Sr. Manuel B. Martínez Giraud (en adelante, "señor Martínez Giraud"), Técnico Legal (Juez Administrativo) del Departamento de Asuntos del Consumidor (en adelante, "DACo"). En ella, adujo que, para el año 2017, el señor Martínez Giraud visitaba con frecuencia el comercio Power Sports Warehouse, Inc. (en adelante, "PSW") y allí se reunía con la Sra. Elma Santiago Aquino (en adelante, "señora Santiago Aquino"), quien era la representante designada para atender los casos de PSW ante el DACo. Ello, para presuntamente asesorar a esta última sobre los casos que --

ante la referida agencia gubernamental -- se presentaban en contra de la mencionada empresa.

Entre otras cosas, la Oficina de Ética Gubernamental arguyó que una de las aludidas reuniones -- entre el señor Martínez Giraud y la señora Santiago Aquino -- fue grabada y difundida en Telemundo Responde, segmento que forma parte del noticiario Telenoticias, del Canal 2. Asimismo, expresó que las actuaciones del señor Martínez Giraud con relación a las mencionadas visitas ponían en duda la imparcialidad e integridad de todo servidor público y atentaban contra la rectitud e integridad que debía permear en toda persona que representaba la función gubernamental.

**Por todo lo anterior, la Oficina de Ética Gubernamental le imputó al señor Martínez Giraud infracción a los Arts. 4.4(c) y 4.2(s) de la Ley de Ética Gubernamental de Puerto Rico de 2011, *infra*. Esto, al ofrecer asesoramiento a una persona privada o negocio sobre asuntos pendientes ante la agencia administrativa en la que éste se desempeña como Juez Administrativo y al llevar a cabo acciones que colocaban en entredicho la imparcialidad e integridad de la función gubernamental, respectivamente.**

Enterado de ello, el 29 de agosto de 2018 el señor Martínez Giraud contestó la querella en su contra. En su escrito, negó los hechos imputados, así como el haber incurrido en conducta impropia alguna. En igual tono, alegó que la grabación que se le tomó y que se hizo formar parte del reportaje de Telemundo Responde era ilegal, pues nunca

prestó su consentimiento para ésta. Asimismo, arguyó que no había incurrido en conducta constitutiva de violación alguna a la Ley de Ética Gubernamental de Puerto Rico de 2011, *infra*, en sus casi cuarenta (40) años de servicio público.

Así las cosas, el 26 de febrero de 2019 y el 27 de marzo de 2019 la Oficina de Ética Gubernamental celebró la vista administrativa de rigor. Durante ésta, la referida agencia gubernamental presentó los testimonios de la Sra. Norma I. Román Rosa, empleada del DACo, así como de los exempleados de PSW, la Sra. Coralis Cora González, la Sra. Lumarie Figueroa Hernaiz, el Sr. Jean Paul Hernández Padilla y la Sra. Yimaris Rosado Serra.[1] Además, se presentó el testimonio del Sr. José Juan Sánchez Álvarez (en adelante, "señor Sánchez Álvarez"), cliente de PSW y quien instó una querella en contra del referido negocio ante el DACo.[2] Por parte del

---

[1] **La señora Figueroa Hernaiz y la señora Cora González, ambas exempleadas de PSW, manifestaron haber visto al señor Martínez Giraud en distintas ocasiones en el área de trabajo de la señora Santiago Aquino, donde éstas observaron documentos y expedientes del DACo.** Por su parte, la señora Román Rosa declaró que el reportaje televisivo no le causó sorpresa puesto que el programa pretendía ejercer una función que le correspondía al DACo.

[2] En específico, del testimonio del señor Sánchez Álvarez surge lo siguiente:

P Le pregunto, señor Sánchez, cuando vio el reportaje en el canal de televisión, ¿cuál fue su impresión del funcionario de DACO que salió en el reportaje?

R Tristeza. Me sentí triste porque uno no espera eso de los funcionarios públicos porque usted... Mira, un empleado público, y menos que trabaje en una agencia como DACO —y que esté nombrado bajo un cargo de Juez— lo menos que puede dar la impresión, ni la apariencia, es de que está prácticamente truqueando con los casos.

Y el mero hecho de sentarse con el empleado de Power... Mira, usted tiene que evitar —en la medida de lo posible— de visitar esa tienda porque su mera presencia en esa tienda se presta para mil cosas.

señor Martínez Giraud, prestaron testimonio la señora Santiago Aquino y el Sr. José Orlando Alicea Barreto, empleado del DACo.

**Evaluada la prueba testifical y documental objeto de consideración en el caso de marras, el 6 de noviembre de 2019 la Oficial Examinadora sometió su correspondiente *Informe*.[3] En esencia, la Oficial Examinadora determinó que, aun cuando el señor Martínez Giraud no atendió ninguna de las querellas presentadas en contra de PSW ante el DACo, éste infringió el Art. 4.2(s) de la Ley de Ética Gubernamental de Puerto Rico de 2011, *infra*.**

En particular, en su *Informe*, la Oficial Examinadora destacó que el testimonio del señor Sánchez Álvarez le mereció entera credibilidad, pues se desprendía que el reportaje de Telemundo Responde ocasionó que éste, como consumidor y cliente de PSW, desconfiara de las funciones del DACo, así como del trámite de los procedimientos y de la ética de sus funcionarios. Además, la Oficial Examinadora

---

Entonces, ¿qué pasa? ¿Cómo es posible que usted, aunque sea cliente, usted no evite...? Mire, por ejemplo, yo. Yo trabajo para una empresa que se llama MCS. Pues, yo por lo regular, evito contacto con los demás planes médicos para evitar la impresión de que yo esté llevando información, ya sea de mi empresa hacia las demás competencias de la empresa.

Pues, lo menos que se espera de un Juez que esté llevando a cabo una auditoría o que tenga casos pendientes de una compañía es que menos visite la agencia; como le pasó. Véase, Apéndice del *certiorari*, págs. 631-632.

[3] La Oficial Examinadora hizo constar que tomó conocimiento oficial de cierta *Resolución* emitida por el DACo el 7 de agosto de 2018 en la Querella Núm. SAN-2017-000196, *José Juan Sánchez Álvarez v. Power Sports Warehouse*, Inc., así como del caso Civil Núm. CJ20180V0613 incoado el 9 de febrero de 2018 ante el Tribunal de Primera Instancia. En este último pleito, relacionado con reclamaciones laborales y daños y perjuicios, cuatro (4) testigos de la Oficina de Ética Gubernamental figuraban como demandantes en dicha acción presentada en contra de PSW.

señaló que la conducta del señor Martínez Giraud produjo en el señor Sánchez Álvarez una impresión de imprudencia, parcialidad e incorrección tanto del funcionario en cuestión como de la propia agencia administrativa. Así, concluyó que la mencionada conducta provocó que el señor Sánchez Álvarez colocara en tela de juicio la confiabilidad con la que el DACo manejaría la querella que había presentado ante dicha agencia. **Por lo tanto, la Oficial Examinadora consideró probado que la apariencia de conducta impropia del señor Martínez Giraud laceró la confianza e imparcialidad de la función del DACo.**

Recibido el *Informe* de la Oficial Examinadora, el 21 de noviembre de 2019 la Oficina de Ética Gubernamental emitió una *Resolución* mediante la cual adoptó el mismo. Al así hacerlo, impuso una multa administrativa al señor Martínez Giraud de $8,000.00 tras concluir que este último incurrió en violación al Art. 4.2(s) de la Ley de Ética Gubernamental de Puerto Rico de 2011, *infra*.

En desacuerdo, el señor Martínez Giraud presentó una moción de reconsideración ante la mencionada agencia administrativa. La misma fue declarada no ha lugar mediante una *Resolución* notificada el 12 de diciembre de 2019.

Aún inconforme con el proceder de la Oficina de Ética Gubernamental, el 13 de enero de 2020 el señor Martínez Giraud presentó un recurso de revisión judicial ante el Tribunal de Apelaciones. En su escrito, en esencia, adujo que la mencionada agencia administrativa erró al imponerle

la aludida multa, pues la totalidad de la prueba documental y testifical desfilada ante el referido ente gubernamental no demostró que hubiese incurrido en conducta impropia alguna. Ello, toda vez que la grabación que se le tomó y que se integró al reportaje de Telemundo Responde no formó parte de la prueba desfilada ante el mencionado ente administrativo.

**Tras varios trámites procesales no necesarios aquí pormenorizar,[4] y atendidos los planteamientos de ambas partes, el 17 de diciembre de 2019 el foro apelativo intermedio notificó una *Sentencia* mediante la cual confirmó la *Resolución* emitida por la Oficina de Ética Gubernamental. En suma, resolvió que la actuación de la agencia fue razonable a la luz de la prueba desfilada y que el señor Martínez Giraud debió prever que su conducta podía ser percibida como contraria a la ley**. Concluyó, además, que éste nunca rebatió -- mediante preponderancia de la prueba -- la percepción pública sobre la falta de confianza e imparcialidad en sus funciones como consecuencia de las actuaciones objeto de esta controversia.

Insatisfecho con dicho dictamen, el 19 de enero de 2021 el señor Martínez Giraud instó un recurso de *certiorari* ante este Tribunal. En esencia, señala que el foro *a quo* erró al confirmar la *Resolución* dictada por la Oficina de Ética

---

[4] Entre ellos, un *Alegato suplementario de la parte querellada-recurrente* presentado por el señor Martínez Giraud, así como un *Alegato en oposición al recurso de revisión judicial de determinación administrativa* y un escrito en *Oposición al alegato suplementario de la parte querellada-recurrente* presentados por la Oficina de Ética Gubernamental.

Gubernamental pues, a su juicio, ello no encuentra apoyo a la luz de la totalidad de la prueba desfilada ante la referida agencia administrativa. Lo anterior, al sostener que el reportaje televisivo realizado por Telemundo Responde, y la grabación a la que anteriormente se ha hecho referencia, no formaron parte de la prueba presentada ante la Oficina de Ética Gubernamental. En igual tono, sostiene que la percepción del señor Sánchez Álvarez no respondió a la conducta alegada, sino a las imputaciones maliciosas realizadas en su contra en el mencionado reportaje televisivo.

Oportunamente, la Oficina de Ética Gubernamental se opuso. En síntesis, reitera que el testimonio del señor Sánchez Álvarez demostró que las actuaciones del señor Martínez Giraud reflejaron una impresión de imprudencia, parcialidad e incorrección tanto de este último como del DACo. A su vez, insiste en que la Oficial Examinadora no apoyó su determinación en la grabación que se le tomó al señor Martínez Giraud y que se hizo formar parte del reportaje de Telemundo Responde.

Trabada así la controversia, y con el beneficio de la comparecencia de ambas partes en el presente litigio, una mayoría de esta Curia, entre otras cosas, resuelve que, contrario a lo determinado por los foros *a quo*, no procedía encontrar al señor Martínez Giraud incurso en violación el Art. 4.2(s) de la Ley de Ética Gubernamental de Puerto Rico de 2011, *infra*, toda vez que la Oficina de Ética

Gubernamental venía obligada a satisfacer un estándar probatorio claro, robusto y convincente, lo cual no hizo. Como adelantamos, de dicho proceder, respetuosamente disentimos. Nos explicamos.

II.

A.

Como es sabido, la Ley de Ética Gubernamental de Puerto Rico de 2011 (en adelante, "Ley de Ética Gubernamental"), Ley Núm. 1-2012, 3 LPRA sec. 1854 *et seq.*, reglamenta la conducta de los servidores y exservidores públicos [del] [Poder] Ejecutiv[o] mediante el establecimiento de un Código de Ética, el cual se constituye como principio cardinal del estatuto de referencia para proscribir todas aquellas actuaciones improcedentes que laceren la estabilidad del soporte moral gubernamental. Exposición de Motivos de la Ley de Ética Gubernamental, Ley Núm. 1-2012 (2012 [Parte 1] Leyes de Puerto Rico 19); Art. 4.1, 3 LPRA sec. 1857.

A esos fines, la precitada ley provee mecanismos para renovar y reafirmar la función preventiva y fiscalizadora de la Oficina de Ética Gubernamental. Exposición de Motivos de la Ley de Ética Gubernamental, *supra*, pág. 18; *Pueblo v. Arlequín Vélez*, 204 DPR 117, 154 (2020). Tales mecanismos propenden el "establecimiento de un servicio público íntegro, con valores, que mantenga la confianza en sus instituciones y asegure la transparencia en las funciones oficiales". Exposición de Motivos de la Ley de Ética Gubernamental, *supra*, pág. 20.

En aras de lograr tales propósitos, la Oficina de Ética Gubernamental tiene la misión de "educar al servidor público para que, en el desempeño de sus funciones, exhiba los valores de bondad, confiabilidad, justicia, responsabilidad, respeto y civismo que rigen la administración pública". Art. 2.1, 3 LPRA sec. 1855. Véase, también, *Pueblo v. Arlequín Vélez*, *supra*, pág. 154. Asimismo, dicha dependencia gubernamental se encarga de fiscalizar la conducta de los servidores públicos y de penalizar a quienes transgreden las normas éticas que integran los valores del servicio público a través de los mecanismos y los recursos provistos por el precitado cuerpo de ley. *Íd*.

A tono con ello, la Ley de Ética Gubernamental preceptúa distintas sanciones y penalidades -- tanto administrativas como civiles y criminales -- para los servidores públicos que actúen en contravención a lo dispuesto en ésta, o en los reglamentos, órdenes o normas promulgadas a su amparo. Art. 4.7, 3 LPRA sec. 1857f. Específicamente, en aquellos casos en que sea aplicable, la persona que incurra en alguna violación a la mencionada disposición legal puede enfrentarse a una amonestación escrita, suspensión sumaria de empleo, suspensión de empleo y sueldo, y destitución o despido. *Íd*. Así también, en la esfera administrativa, podría enfrentarse a la imposición de una multa que no excederá de veinte mil dólares ($20,000.00) por cada violación.[5] *Íd*.

---

[5] Recuérdese que la Sec. 7.1 de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 38-2017, 3 LPRA sec. 9701, faculta a los organismos

B.

En lo aquí pertinente, el Art. 1.2(gg) de la Ley de Ética Gubernamental, 3 LPRA sec. 1854, define al servidor público como aquella "persona en el Gobierno que interviene en la formulación e implantación de la política pública o no, aunque desempeñe su encomienda permanente o temporalmente, con o sin remuneración". La definición provista por el aludido artículo igualmente "incluye al contratista independiente cuyo contrato equivale a un puesto o cargo, o que entre sus responsabilidades está la de intervenir directamente en la formulación e implantación de la política pública". *Íd.*

Con relación a la conducta de los servidores públicos, el Art. 4.2 de la Ley de Ética Gubernamental, 3 LPRA sec. 1857a, establece las prohibiciones éticas de carácter general por las cuales se regirá la misma. Por ser de particular importancia para la controversia ante nuestra consideración, conviene señalar que el inciso (s) del precitado artículo dispone que "**[u]n servidor público no puede llevar a cabo una acción que ponga en duda la imparcialidad e integridad de la función gubernamental**". (Énfasis suplido). *Íd.*

Así pues, para que se configure una violación a esta disposición estatutaria, deben concurrir los tres (3) requisitos siguientes: 1) que se trate de un servidor

administrativos a imponer multas que no excederán de cinco mil dólares ($5,000.00) por cada violación a las leyes que administran o a los reglamentos emitidos al amparo de éstas. No obstante, en aquellos casos en que la ley especial disponga una penalidad administrativa mayor a la antes mencionada, la agencia podrá imponer la penalidad mayor. *Íd.*

público; 2) que el servidor público de quien se trate lleve a cabo una acción, y 3) que tal acción provoque sospecha sobre la imparcialidad e integridad de la función gubernamental. Como veremos más adelante, tal es el caso de autos.

De otra parte, en cuanto a las prohibiciones relacionadas con la representación de intereses privados conflictivos con las funciones oficiales, el Art. 4.4(c), 3 LPRA sec. 1857c, instituye que "[u]n servidor público no puede, en su carácter privado, representar o asesorar, directa o indirectamente, a una persona privada o negocio ante cualquier agencia, en casos o asuntos que involucren un conflicto de intereses o de política pública entre el Gobierno y los intereses de esa persona privada o negocio".

En fin, con la aprobación de la Ley de Ética Gubernamental, la Asamblea Legislativa materializó su compromiso y obligación de mantener bajo estricto escrutinio la responsabilidad ética de los servidores y exservidores públicos, así como de responder a los reclamos de la ciudadanía respecto a que los servidores públicos presenten una imagen intachable y libre de cualquier conflicto. Exposición de Motivos de la Ley de Ética Gubernamental, *supra*, págs. 19-20.

Cabe preguntarse entonces, ¿cuál es el estándar de prueba que históricamente se ha requerido para poder demostrar que un servidor público ha incurrido en una

violación a la Ley de Ética Gubernamental, y/o a los reglamentos, órdenes o normas promulgadas a su amparo?

C.

**Para contestar la anterior interrogante, basta con señalar que, como principio general del derecho, el estándar o la cantidad de prueba que históricamente se ha requerido en el contexto de los procesos administrativos es el de preponderancia de la evidencia.** J. A. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, 4ta ed. rev., San Juan, 2017, pág. 219. Véase, además, *Steadman v. S. E. C.*, 450 US 91 (1981). Éste ha sido definido como "aquella prueba satisfactoria basada en las circunstancias del caso que produce conciencia de certeza y convicción moral en el ánimo del juzgador; es la prueba requerida para establecer como hechos probados aquellos que con mayores probabilidades ocurrieron". R. E. Ortega Vélez, *Doctrinas Jurídicas: Derecho Puertorriqueño*, 2da ed., San Juan, Ed. SITUM, 2021, pág. 205. También se refiere a "[m]ayor peso de la prueba, no en cuanto a cantidad (número de testigos o de documentos presentados), sino en cuanto a calidad (credibilidad y mayor peso de importantes hechos probados)".[6] I. Rivera García, *Diccionario de Términos Jurídicos*, 3era ed. rev., San Juan, LexisNexis, 2000, pág. 207.

---

[6] "The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other." B. A. Garner, *Black's Law Dictionary*, 10ma ed., West, 2015, pág. 1000.

Asimismo, los tratadistas estadounidenses Hickman y Pierce, citando con aprobación lo resuelto por el Tribunal Supremo de Estados Unidos en *Steadman v. S. E. C.*, *supra*, y en *Vance v. Terrazas*, 444 US 252 (1980), han expresado que este estándar probatorio aplica a la gran mayoría de las acciones de las agencias administrativas. K. E. Hickman & R. J. Pierce, Jr., *Administrative Law Treatise*, 6ta ed., New York, Wolters Kluwer, 2019, Vol. II, pág. 1079 (**"Taken together, the Court's holdings in *Terrazas* and *Steadman* suggest that the preponderance of the evidence standard of proof applies to the vast majority of agency actions."**).

III.

Establecido lo anterior, para la completa disposición de los asuntos ante nuestra consideración, también es menester abordar aquí todo lo relacionado con la doctrina de revisión judicial de las determinaciones administrativas. Según el catedrático Demetrio Fernández Quiñones, en asuntos como los que nos ocupan,

> [l]a función central de la revisión judicial sustantiva es asegurarse de que las agencias actúan dentro del marco del poder delegado y consistente con la política legislativa. De ella emanan los controles del comportamiento administrativo. Por tal razón, la revisión judicial reviste extrema importancia. El control judicial sobre la acción administrativa le garantiza al ciudadano protección y remedio frente al organismo administrativo. D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 3ra ed., Bogotá, Ed. Forum, 2013, pág. 669.

Sobre la doctrina de referencia, y ya más en lo relacionado a los planteamientos que trae consigo la causa de epígrafe, la Ley de Ética Gubernamental consigna que

cualquier servidor público que resulte afectado en un proceso adversativo tendrá derecho a solicitar la revisión judicial del dictamen ante el Tribunal de Apelaciones de conformidad con la Ley de Procedimiento Administrativo Uniforme (en adelante, "LPAU"). Art. 7.3, 3 LPRA sec. 1860b. Cónsono con ello, la Sec. 4.1 de LPAU, 3 LPRA sec. 9672, permite que una parte adversamente afectada por una orden o una resolución final de una agencia administrativa solicite la revisión judicial de ésta ante el foro apelativo intermedio. Por igual, cualquier parte que resulte adversamente afectada por el dictamen emitido por el Tribunal de Apelaciones, podrá solicitar su revisión ante el Tribunal Supremo. Sec. 4.7, 3 LPRA sec. 9677.

Al respecto, -- y como guía en ese proceso de revisión judicial --, el Art. 4.5 de la LPAU, 3 LPRA sec. 9675, establece que las determinaciones de hechos de los organismos administrativos serán sostenidas por el tribunal si se basan en evidencia sustancial que obre en el expediente administrativo, mientras que las conclusiones de derecho serán revisables en todos sus aspectos por el foro judicial. *Super Asphalt v. AFI y otro*, 206 DPR 803, 820 (2021); *Torres Rivera v. Policía de PR*, 196 DPR 606, 627 (2016); *OEG v. Santiago Guzmán*, 188 DPR 215, 226 (2013). **En esa dirección, en repetidas ocasiones, este Foro ha sentenciado que la función revisora de una determinación administrativa debe limitarse a examinar: 1) si el remedio concedido fue razonable; 2) si las determinaciones de hechos están apoyadas**

en evidencia sustancial que obre en el expediente administrativo, y 3) si las conclusiones de derecho realizadas por la agencia administrativa fueron correctas. *Moreno Lorenzo y otros v. Depto. Fam.*, 207 DPR 833, 839-840 (2021); *Torres Rivera v. Policía de PR*, *supra*, págs. 626-627. Véase, también, Echevarría Vargas, *op. cit.*, pág. 313.

En lo relacionado con las determinaciones de hecho, resulta esencial destacar que la evidencia sustancial es aquella "prueba relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". (Énfasis suplido). *Capó Cruz v. Jta. Planificación et al.*, 204 DPR 581, 591 (2020); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 36 (2018); *González Segarra v. CFSE*, 188 DPR 252, 277 (2013). Véase, además, Ortega Vélez, *op. cit.*, pág. 115. De manera que, quien impugne las determinaciones de hechos de una agencia tiene el deber ineludible de producir suficiente evidencia para derrotar la presunción de legalidad y corrección de la decisión administrativa. *Graciani Rodríguez v. Garage Isla Verde*, 202 DPR 117, 128 (2019); *Rolón Martínez v. Supte. Policía*, *supra*, pág. 35; *OEG v. Santiago Guzmán*, *supra*, págs. 226-227.

Es decir, la parte que cuestiona las determinaciones de hechos debe demostrar que existe otra prueba en el expediente que reduce o menoscaba el valor probatorio de la evidencia impugnada a tal nivel que no permite concluir que la determinación del foro administrativo fue razonable a la luz de la totalidad de la prueba contenida en el expediente.

*Graciani Rodríguez v. Garage Isla Verde*, *supra*, págs. 128-129; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216-217 (2012). Véase, Ortega Vélez, *op. cit.*; Echevarría Vargas, *op. cit.*, pág. 222. De ahí que, la deferencia que los foros apelativos estamos llamados a otorgar a las agencias administrativas cede cuando está presente alguna de las circunstancias siguientes:

> (1) la determinación administrativa no está basada en evidencia sustancial; (2) cuando el ente administrativo ha errado en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el organismo administrativo actúa arbitraria, irrazonable, o ilegalmente, realizando determinaciones carentes de una base racional, o (4) cuando la actuación administrativa lesiona derechos constitucionales fundamentales. *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800, 822 (2012). Véase, también, *Super Asphalt v. AFI y otro*, *supra*; *ECP Incorporated v. OCS*, 205 DPR 268, 281 (2020).

En ese sentido, valga recordar que este Tribunal ha pronunciado en innumerables ocasiones que el referido principio de deferencia no es absoluto ni impide a los tribunales revisar todas aquellas determinaciones o interpretaciones del ente administrativo que sean irrazonables, ilegales o contrarias a derecho. *Super Asphalt v. AFI y otro*, *supra*; *ECP Incorporated v. OCS*, *supra*; *Graciani Rodríguez v. Garage Isla Verde*, *supra*, pág. 127. Con ello en mente, queda establecido el estándar o principio rector de la norma de deferencia, a saber, la razonabilidad de la decisión administrativa. *Super Asphalt v. AFI y otro*, *supra, pág. 820*; *Graciani Rodríguez v. Garage Isla Verde*, *supra*.

Queda también establecido que los dictámenes emitidos por los foros administrativos están revestidos de una presunción de regularidad y corrección. *ECP Incorporated v. OCS*, *supra*; *Rolón Martínez v. Supte. Policía*, *supra*; *González Segarra et al. v. CFSE*, *supra*, pág. 276. Véase, también, Echevarría Vargas, *op. cit.*, pág. 314. Presunción que encuentra su razón en la vasta experiencia, peritaje y conocimiento especializado de las agencias para atender los asuntos que les han sido delegados por ley. *Moreno Lorenzo v. Depto. Fam.*, *supra*, pág. 839; *Super Asphalt v. AFI y otro*, *supra*, pág. 819; *ECP Incorporated v. OCS*, *supra*.

Es, pues, a la luz de la normativa antes expuesta, y no de otra, que estábamos llamados a atender el presente caso. Como una mayoría de este Tribunal no lo hizo, procedemos -- desde el disenso -- a así hacerlo.

IV.

Como mencionamos anteriormente, en el presente caso, el señor Martínez Giraud aduce que el Tribunal de Apelaciones erró al confirmar la *Resolución* emitida por la Oficina de Ética Gubernamental pues, a su juicio, la totalidad de la prueba documental y testifical desfilada en el caso de marras refleja que no incurrió en violación alguna al Art. 4.2(s) de la Ley de Ética Gubernamental, *supra*. No le asiste la razón.

Y es que, a la luz de la totalidad del expediente ante nuestra consideración, queda patentemente probado que la Oficina de Ética Gubernamental demostró mediante

preponderancia de la prueba que el señor Martínez Giraud desplegó la conducta imputada y, en consecuencia, infringió el Art. 4.2(s) de la Ley de Ética Gubernamental, *supra*.[7] Conducta que, sin lugar a duda, laceró la integridad y parcialidad del DACo y es contraria a la imagen intachable y libre de cualquier conflicto que debe caracterizar a cualquier servidor público de nuestro País. Con dicho proceder, el señor Martínez Giraud se apartó de los valores de bondad, confiabilidad, justicia, responsabilidad, respeto y civismo que deben regir la sana administración pública.

Así, y conforme a la normativa previamente esbozada, procedía, pues, que este Tribunal únicamente revisara si, a la luz de la totalidad del expediente, la Oficina de Ética Gubernamental probó mediante preponderancia de la prueba que el señor Martínez Giraud infringió el estatuto de referencia. Al realizarse dicho ejercicio, la respuesta que salta a la vista es en la afirmativa.

No obstante, lejos de lo anterior, una mayoría de mis compañeros y compañera de estrado hoy establecen un estándar probatorio mayor -- entiéndase, prueba clara, robusta y convincente -- para disponer de casos como el de autos; con la grave consecuencia de hacer más difícil la labor fiscalizadora de la Oficina de Ética Gubernamental. Ello,

---

[7] En específico, y a través del testimonio de varias personas con conocimiento personal de lo testificado por ellas, quedó demostrado que el señor Martínez Giraud se reunió varias veces -- con determinados expedientes en mano -- con la señora Santiago Aquino en PSW, comercio contra el cual pesaban ciertas querellas ante el DACo. Al así actuar, el señor Martínez Giraud produjo una impresión de imprudencia, parcialidad e incorrección tanto de sí mismo, en su carácter de funcionario público, como del DACo.

en los tiempos tan convulsos y complejos que vivimos como sociedad, como mínimo, nos resulta en extremo lamentable.

**Variar el estándar de prueba que, históricamente, ha cobijado a los procedimientos administrativos, sin una razón fundamentada para ello, -- más allá de señalar que éste es el estándar que se utiliza en los procedimientos disciplinarios ante este Tribunal --, con el único motivo de forzar un resultado como al que llega la mayoría de esta Curia, no es una práctica deseable. Al así proceder, los jueces y la jueza que suscriben la *Opinión* del Tribunal le imprimen características distintivas de los procedimientos judiciales a los procedimientos administrativos y, en consecuencia, laceran la naturaleza de estos últimos. Con ello, no podemos estar de acuerdo.**

Procedía aquí confirmar la *Sentencia* dictada por el foro *a quo*. No se cometieron los errores señalados por el señor Martínez Giraud.

V.

Es, pues, por los fundamentos expuestos, que respetuosamente disentimos del curso de acción seguido por una mayoría de este Tribunal en el día de hoy.


Ángel Colón Pérez
Juez Asociado